# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Victoria Mens, a Special Agent within the U.S. Department of Health and Human Services, Office of Inspector General, Office of Investigations, being first duly sworn, hereby depose and state as follows:

## Affiant's Background

1. I am a Special Agent with the U.S. Department of Health and Human Services Office of Inspector General ("HHS-OIG") and am currently assigned to the Boston Regional Office. I have been a Special Agent with HHS-OIG for approximately seven years. Prior to working with the Boston Regional Office beginning in August 2024, I worked for the HHS-OIG Kansas City Regional Office. As a Special Agent with HHS-OIG, I have received law enforcement training, and I have been personally involved in investigations concerning a variety of federal criminal offenses involving health care providers.

2. The facts set forth in this Affidavit are based upon my personal observations, my training and experience, discussions with other law enforcement agents and officers, documents and records that were collected and reviewed in the course of this investigation, and reports prepared by individuals familiar with the subject of this Affidavit. This Affidavit is intended merely to show that there is probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this Affidavit are related in substance and in part only.

## Purpose of the Affidavit

3. I submit this affidavit in support of a warrant to search information associated with the following Microsoft accounts: cbarnett@icbdholdings.com and cb@icbdholdings.com (which are associated with Christopher Barnett); mholzum@icbdholdings.com and

mholzum@abacenters.com (which are associated with Michael Holzum); efoust@exactbilling.com (which is associated with Eric Foust); swestberg@abacenters.com (which is associated with Shawn Westberg); emcdonough@icbdholdings.com and emcdonough@abacenters.com (which are associated with Ed McDunough); esantagati@abacenters.com (which is associated with Emily Santagati); jc@icbdholdings.com, jcabrera@icbdholdings.com, and jcabrera@abacenters.com (which are associated with Javier Cabrera); michaeljr@icbdholdings.com (which is associated with Michael Holzum Jr.); bkelly@exactbilling.com (which is associated with Barbara Kelly); sglidden@icbdholdings.com and sglidden@abacenters.com (which are associated with Sarah Glidden); qdavis@icbdholdings.com, qdavis@abacenters.com, qdavis@abacentersfl.com, and qdavis@abacaresfl.com (which are associated with Quatiba Davis); sdelmauro@icbdholdings.com and sdelmauro@abacenters.com (which are associated with Steve Del Mauro); wklein@exactbilling.com (which is associated with William Klein); and nirvine@icbdholdings.com (which is associated with Nathaniel Irvine) (collectively, the "SUBJECT ACCOUNTS") that is stored at premises owned, maintained, or operated by Microsoft Corporation ("Microsoft"), an email, website, and cloud services provider headquartered at One Microsoft Way, Redmond, Washington.

4. In the event that the information belongs to a Microsoft enterprise customer, the government will not be able to request the data directly from the enterprise customer without compromising the integrity of the investigation. Therefore, I request that Microsoft retrieve all electronically stored information and preserve and produce it.

5. The property (information) to be searched is described in the following paragraphs and in Attachment A, attached hereto, and incorporated as if fully set forth herein.

6. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Microsoft to disclose to the government records and other information in its possession (including the content of communications) located within the SUBJECT ACCOUNTS. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

7. The items to be seized are the fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Section 1035 (false statement related to a health care matter); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 1347 (health care fraud); Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud and health care fraud); Title 18, United States Code, Section 1956(h) (conspiracy to commit money laundering); and Title 18, United States Code, Section 1957 (transacting in criminal proceedings) (collectively the "TARGET OFFENSES"), as further described in Attachment, which is also incorporated herein by reference.

**Summary of Probable Cause**

8. This request of search warrants originates from an investigation into a group of purported applied behavior analysis clinics, ABA Centers of America ("ABACA"), for billing both federal and private health care benefit programs for medically unnecessary services, creating false and fraudulent records in order to justify higher reimbursements for services (such as by intentionally misrepresenting a place of service), and fraudulently manipulating and distorting the health care market by mandating that their employees become non-credentialed with health care insurance benefit programs so that ABACA could bill services at a higher, out-of-network rate.

9. This evidence, as well as other evidence described below, establishes probable cause to believe that the owners and operators at ABACA, ICBD HOLDINGS, and EXACT

BILLING SOLUTIONS, including Christopher Barnett ("BARNETT"), Michael Holzum ("HOLZUM"), and others associated with these businesses submitted fraudulent requests for reimbursement for medically unnecessary services. There is further probable cause to believe that BARNETT, HOLZUM, and others then used the ill-gotten proceeds from this fraudulent billing to make extravagant purchases to support a lavish lifestyle, such as luxury automobiles and a private plane.

10. Additionally, there is probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES will be found during the search of the SUBJECT ACCOUNTS.

**Jurisdiction**

11. This Court has jurisdiction to issue the requested warrants because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within the District of New Hampshire. *See* 18 U.S.C. § 3237.

**Relevant Entities and Individuals**

12. ABACA is a health care provider of applied behavioral analysis therapy for children and minors diagnosed with a condition within the autism spectrum. ABACA submits claims for payment to the New Hampshire and Massachusetts Medicaid Programs and various other private health care benefit programs, also known as insurance carriers. ABACA is a Limited Liability Company organized under the laws of Delaware. According to its website, ABACA has various locations, including in New Hampshire, Massachusetts, among other states. The New Hampshire Secretary of State business records for ABACA indicate that its principal place of business is 110

East Broward Blvd., Suite #1100, Fort Lauderdale, Florida 33301. The authorized business manager is listed as Agile Enterprises, LLC, located at the same address. Florida Secretary of State business records for Agile Enterprises, LLC, list BARNETT as an "Authorized Person" and describe him as a member.

13. BARNETT was ABACA's Chief Executive Officer ("CEO") until approximately early December 2024. Since that time, BARNETT has served as Chairman of ABACA.

14. HOLZUM has been ABACA's Chief People Officer and Chief of Staff. According to email communication between BARNETT and HOLZUM, HOLZUM initiated many of the marketing and bonus structures used at ABACA. He was in frequent communication with BARNETT regarding ABACA's finances, including ABACA's utilization review of treatment hours and BARNETT's use of funds, such as the purchase of a private plane. According to ABACA former employees and email communication between BARNETT and HOLZUM, HOLZUM, was aware that ABACA misrepresented to insurance carriers that services had been rendered in New Hampshire, in order to maximize reimbursement rates.

15. ABACA was owned by ICBD HOLDINGS LLC ("ICBD HOLDINGS"). ICBD HOLDINGS is a Limited Liability Company organized under the laws of Florida. The Florida Secretary of State business records for ICBD HOLDINGS indicate that its principal place of business is 110 East Broward Blvd., Suite #2400, Fort Lauderdale, FL 33301. The authorized business manager is listed as Agile Enterprises, LLC.

16. Requests for reimbursement on behalf of ABACA were submitted to insurance carriers by EXACT BILLING SOLUTIONS LLC ("EXACT BILLING"), which is also owned by ICBD HOLDINGS. EXACT BILLING is a Limited Liability Company organized under the laws of Florida. The Florida Secretary of State business records for EXACT BILLING indicate that its

principal place of business is 4620 North State Road 7, Suite #300, Lauderdale Lakes, FL 33309. The authorized business manager is listed as Agile Enterprises, LLC, located at 110 East Broward Blvd., Suite #1100, Fort Lauderdale, FL 33301. The principal is listed as Michael Holzum Jr., at the location of EXACT BILLING.

17. ABA Connect is an electronic-medical-record provider developed by ICBD HOLDINGS employees and housed in Medellín, Colombia. ABACA stores and maintains its records through the Colombia-based ABA Connect.

**Background on Applied Behavior Analysis**

18. Applied Behavior Analysis ("ABA") is a type of therapy intended for use in patients on the autism spectrum and other developmental disorders. It is designed to assist these patients in learning new skills, such as appropriate social interactions or hygiene, and minimizing challenging behavior, such as violent outbursts. A Board-Certified Behavior Analyst ("BCBA") assesses the patient and creates a treatment plan, with a recommended number of treatment hours. The BCBA must have a qualifying degree, such as a master's degree or doctorate. Registered Behavior Technicians ("RBTs") then provide much of the actual ABA services, acting under the supervision of the BCBA and in accordance with the BCBA's treatment plan. The BCBA then routinely reviews the patient's progress and adjusts the treatment plan accordingly. Both the BCBA and RBT are required to create session notes in order to document the patient's progress.

**Health Care Benefit Programs**

19. A "health care benefit program" under Section 24(b) of Title 18, United States Code, is defined as any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity

who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

20. Medicaid was a federal- and state-funded health care program providing benefits to individuals and families who met specific financial and other eligibility requirements. The U.S. Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), was responsible for overseeing Medicaid in participating states, including Massachusetts and New Hampshire.

21. BlueCross BlueShield, Harvard Pilgrim Health Care, Tufts Health Plan, United Healthcare, Optum, Cigna, Anthem, and Aetna offer private health care benefit programs and government-funded health care benefit programs, such as Medicaid managed care plans, that provide insurance contracts and plans affecting interstate commerce, under which medical benefits, items, and services are provided to individuals.

22. Many health care benefit programs have a credentialing process to grant medical providers "in-network" status. Through the credentialing process, health care benefit programs verify the education, training, and experience of medical providers. When a provider is granted in-network status with a health care benefit program, they are considered a "credentialed," in-network provider and are then able to submit claims for reimbursement for treating patients who have coverage through that health insurance plan. A credentialed provider agrees to receive a discounted reimbursement rate for medical services rendered. A "non-credentialed" provider is one who has not been credentialed and verified by a health care benefit program and is therefore considered out-of-network.

23. To receive payment for services rendered, a provider is required to submit a claim to the health care benefit program. Among other information, the claim generally requires the

provider to indicate the date of service for the procedure, service received, diagnosis, place of service, and "CPT code," which refers to the "Current Procedural Terminology" codes used for billing particular medical procedures and services.

24. A "single-case agreement" generally refers to a contract between a private health care benefit program and an out-of-network provider that allows a patient to see the out-of-network provider while using their in-network benefits. Private health care benefit programs rely upon the truth and accuracy of information furnished by providers to support the approval of single-case agreements.

25. Health care benefit programs and/or private insurance carriers rely upon the truth and accuracy of the claims submitted by providers to determine whether to pay the provider for the services rendered. Claims for services also must be based on medical necessity. If a health care benefit program knew that a particular claim was predicated on materially false and fraudulent pretenses and representations, or lacked medical necessity, the health care benefit program would not pay the claim.

**Probable Cause to Believe the TARGET OFFENSES Were Committed**

26. The investigation thus far has revealed that ABACA fraudulently billed health care benefit programs through EXACT BILLING for medically unnecessary services purportedly rendered in the District of Massachusetts, District of New Hampshire, and elsewhere by submitting claims that misrepresented the place of service, rendering provider, and medical necessity of the services.

27. ABACA, through EXACT BILLING, additionally billed for services that did not qualify as legitimate medical treatment, such as when a client is napping or watching television. ABACA provided these purported therapy services based not on medical necessity, but based on an internal rating system which categorized child and teenage patients based on the potential

profits that ABACA can earn from that patient's health insurance, from "Super Payors" (also sometimes referred to as "Scholarship Providers"), whose insurance reimbursed the most, to "Scholarship" clients, whose insurance reimbursed the least.

28. ABACA ensured that it received the highest reimbursement possible for these fraudulent and medically unnecessary services by requiring that its providers, who were in-network with insurance carriers before they started with ABACA, "de-credential" and thus become out-of-network with those insurance carriers, so that ABACA could receive the higher, out-of-network reimbursement rate.

29. As set forth below, through interviews of former ABACA employees, parents whose children were former clients of ABACA, and personnel employed by various insurance carriers, the investigation has established probable cause to believe that BARNETT, HOLZUM, and others associated with ABACA, ICBD HOLDINGS, and EXACT BILLING have caused the submission of claims for reimbursement for medically unnecessary services purportedly provided to child patients on the autism spectrum.

## I. <u>Interviews with Former ABACA Employees</u>

30. The investigative team has interviewed a number of former employees from ABACA, EXACT BILLING, and ICBD HOLDINGS companies, including Directors of Operations, Directors of Admissions, Admissions Coordinators, Clinical Directors, Utilization Review Specialists, and Board-Certified Behavior Analysts.

31. In summary, these individuals describe a scheme in which BARNETT, HOLZUM, and others at ABACA, EXACT BILLING, and ICBD HOLDINGS categorized their minor and teenage clients on the basis of insurance reimbursement, from Super Payors to Scholarship Clients, and then required that employees prescribe as many hours as possible to these clients based on

insurance reimbursement (rather than what was medically necessary). BARNETT, HOLZUM, and others then instructed that employees bill for services out of whatever clinic location would receive the most from insurance, regardless of where services were actually provided. BARNETT, HOLZUM, and others set a threshold number of billable hours that had to be prescribed and provided. Employees that exceeded that number were referred to as "high highs" and received on-the-spot cash bonuses, trips, and luxury items. Those who questioned the appropriateness of prescribing medically unnecessary hours were called "bottom feeders" and fired.

32. What follows is a non-exhaustive summary of some of the statements provided by former employees.

**A. Kate Berlongieri, Exact Billing Solutions Director of Operations**

33. On January 23, 2025, the government interviewed Kate Berlongieri ("Berlongieri"), who began working at EXACT BILLING as a Director of Training and Development and Director of Operations in July 2022.

34. Berlongieri reviewed billing reports and data, which she then provided to BARNETT. BARNETT utilized Zoom, text, email, and phone calls to communicate with Berlongieri. BARNETT was a hostile employer who used fear to force employees to comply with his directives or risk being fired. BARNETT would call employees, including Berlongieri, and require that they meet him at ICBD HOLDINGS' office.

35. ABACA utilizes a proprietary electronic medical records system, called ABA Connect. ABA Connect has its base of operations in Colombia. According to Berlongieri, the system routinely up-coded or down-coded the number of service units billed for services rendered and adjusted the providers' names and/or notes originally outlined in the medical records as well as the place of service. Berlongieri exported Billing Census reports from ABA Connect and

noticed discrepancies between the medical records and the data reported from ABA Connect. For example, the medical record outlined the number of units rendered was 7, but the Billing Census report exported from ABA Connect outlined the number of units rendered was increased to 8.

36. Berlongieri recounted an instance in March or April 2023 in which she confronted the majority of the C-suite executives of ICBD HOLDINGS about fraudulent billing. Berlongieri informed management that ABACA's billing was unethical, illegal, and fraudulent. Attendees included Jonathan Gomberg, Rusty Taylor, Michael Holzum Jr. (who is associated with some of the SUBJECT ACCOUNTS), William Klein, Barbara Kelly (who is associated with some of the SUBJECT ACCOUNTS), Stephen Del Mauro (who is associated with some of the SUBJECT ACCOUNTS), and Sean Westford.[1] Although BARNETT was not at the meeting, Berlongieri had discussed her concerns with him on several instances before the meeting.

37. Berlongieri did not believe that the reporting from ABA Connect was accurate in comparison to the services that were actually rendered by ABACA. Berlongieri identified the following issues:

a. Discrepancies between the actual time that ABACA employees spent with patients when compared to the times listed in the data reports generated by ABA Connect.

b. Discrepancies between the place of service codes listed in the data reports compared to where services were actually rendered. Berlongieri was instructed to bill the service based on a higher reimbursement rate, because changing the place of service to New Hampshire resulted in a higher reimbursement. Berlongieri confirmed these directives were issued by BARNETT.

---

[1] Based on our investigation, I believe that this likely refers to Shawn Westberg, ICBD HOLDINGS' Director of Admissions, who is discussed elsewhere in this affidavit and is associated with some of the SUBJECT ACCOUNTS.

38. Berlongieri confirmed that there were written communications from BARNETT with explicit instructions to follow company directives, which were sent via email to several different departments.

39. After Berlongieri confronted ABACA management, she was instructed that she should look for a new job, if she did not agree with the billing practices. Berlongieri subsequently left the company.

**B. Christina Peddlar, EXACT BILLING Utilization Review Specialist**

40. On January 24, 2025, the government interviewed Christina Peddlar ("Peddlar"), who started working at EXACT BILLING in August 2022, where she was supervised by William Klein (who is associated with some of the SUBJECT ACCOUNTS).

41. Peddlar was tasked with submitting authorization requests for applied behavior analysis, as well as initial assessments, treatment plans, and re-authorizations to insurance carriers, including Optum/UnitedHealthcare, Cigna, Anthem, Harvard Pilgrim, Tufts, and BCBS Massachusetts.

42. EXACT BILLING requested reimbursement of over $200 per 15 minutes of applied behavior analysis provided by ABACA. Treatment plans would prescribe therapy hours that were based on the patient's insurance, with those with higher insurance reimbursement rates getting more hours. Those clients were referred to as "Super Payors." Eventually, the company began referring to those clients as "Scholarship Providers."

43. If clients were identified as super payors, their treatment plan was formulated by a separate assessment team, led by Quatiba Davis (ICBD HOLDINGS' Chief Clinical Officer, who is associated with some of the SUBJECT ACCOUNTS). Peddlar believed that "the assessment team was there to prescribe the most hours." The clinicians actually providing the services at

ABACA complained about the assessment teams because there were always differences of opinion between the clinicians who provided services and the assessment team. Peddlar believed that there were "clinically unnecessary hours being prescribed" by the assessment team. ABACA had staff in Florida who performed diagnostic testing that were not doctors, despite the fact that such testing and evaluations are required to be performed by a doctor.

44. Peddlar recalled that patients would continue to receive thirty to forty hours per week of applied behavior analysis therapy after being with ABACA for over eighteen months. Peddlar identified this as a "red flag" because the treatment hours for those "Super Payor" clients were not changing.

45. If ABACA locations met the high number of hours prescribed, such as eleven to twelve hours of applied behavior analysis therapy per day, then those clinics would receive a bonus payment.

46. EXACT BILLING initially sought single-case agreements with insurance carriers that did not have out-of-network benefits. After EXACT BILLING management realized that they received a "really high" rate of reimbursement for their requests for reimbursement under single-case agreements, however, they began seeking single-case agreements for every patient. Peddlar specifically heard about a meeting in which BARNETT instructed staff to convert every single patient to a single-case agreement. Other management, including Eric Foust, Michael Holzum Jr., and Shawn Westberg (all three of whom are associated with some of the SUBJECT ACCOUNTS) also pushed for single-case agreements. The purpose of obtaining single-case agreements was to get, "more money per unit of the service code" that was billed. ABACA dismissed patients for whom they could not secure single-case agreements and the reimbursement they wanted. Peddlar

was then tasked with filing "unnecessary appeals" when insurance carriers declined to provide a single-case agreement.

**C. Chad Hodgdon, ABACA Admissions Coordinator**

47. On January 23, 2025, the government interviewed Chad Hodgdon ("Hodgdon"), who worked for a company owned by ICBD HOLDINGS for four months in 2020 before eventually starting with ABACA, where he worked as an Admissions Coordinator.

48. Hodgdon said that ABACA would send bills to their patients, requesting payment, but would tell those patients that they could do what they wanted with the bills and that they would not be sent to collections.

49. Hodgdon had daily meetings on Microsoft Teams regarding the "pipeline," which referred to clients that were set to begin services and needed single-case agreements. BARNETT frequently reviewed the topics in the pipeline. BARNETT directed ABACA employees to pursue single-case agreements with insurance carriers. Hodgdon believed that ABACA's main motivation was reimbursement, not medical necessity. ABACA would keep patients waiting for up to a year to receive services, telling the patients that they could not provide treatment without a single-case agreement.

50. ABACA claimed that services were provided in New Hampshire, in order to maximize reimbursement, when they were in fact provided in Massachusetts. ABACA maintained a map of the state of Massachusetts that grouped patients by location to determine which New Hampshire location should be used to bill. If a client lived somewhere in or between Worcester and Framingham/Lowell, Massachusetts, that client was billed as though the service was provided in Nashua, New Hampshire. If a client lived in Boston or north of Boston, they were billed as though the service was provided in Portsmouth, New Hampshire. If a patient lived south of

Boston, then they were billed to Salem, New Hampshire. Hodgdon believed that this directive came from BARNETT. If an employee expressed concern about the practice, then the employee was fired.

51. ABACA categorized patients based on insurance reimbursement, including "Super Payors."

52. If clients failed to meet the high number of hours prescribed, including over thirty hours of treatment per week, the clients were placed on a contract to complete hours or were let go from treatment.

53. Hodgdon said that ICBD HOLDINGS pays for BARNETT's home in Fort Lauderdale.

**D. Larissa Fedak, ABACA Clinical Director / Director of Diagnostics**

54. On April 23, 2025, and October 7, 2025, the government interviewed Larissa Fedak ("Fedak"). Fedak started with ABACA as a Clinical Director in July 2021 and worked at the company until April 2023. At the time, BARNETT was the CEO and HOLZUM was the Chief People Officer. Fedak was then promoted to Director of Diagnostics, where she recorded autism testing, scored the assessment, and drafted reports which were then reviewed by diagnosing specialists reimbursed by ABACA.

55. While Fedak worked at ABACA, the company billed BlueCross BlueShield clients out of New Hampshire locations and made twice the revenue. BARNETT thereupon implemented a billing practice wherein Massachusetts patients would be billed out of New Hampshire, even though the services were not provided there. According to Fedak, the practice was well known within ABACA and addressed in companywide meetings with the admissions team, as well as

BARNETT, HOLZUM, and Emily Santagati (ABACA's Chief Clinical Officer, who is associated with some of the SUBJECT ACCOUNTS).

56. ABACA categorized its patients based on what their insurance would reimburse. BARNETT then visited ABACA clinics to show the breakdown of patients, based on those reimbursement categories. "Super Payors" had to be prescribed forty hours of ABA services per week. ABACA then gave preference to "Super Payors" and sent ABACA staff on vacation with patients and to community events like bowling alleys and picnics. Fedak did not believe that these events qualified as ABA services, because such services need to be structured, have data collected, and address specific goals. She was instructed by the Executive Director of ABACA's Salem, New Hampshire, location that ABACA wanted staff to go bowling with patients so that ABACA could bill for services.

57. In summary, Fedak said that ABACA is a "giant billing mill" and "everything is a lie."

**E. Amanda Morton, ABACA Clinical Director**

58. On January 23, 2025, the government interviewed Amanda Morton ("Morton"). Morton received her master's degree at New Mexico State University and has been a Board-Certified Behavior Analyst ("BCBA") since August 2015.

59. Morton worked at ABACA from March 2022 through January 22, 2025. During her tenure, she worked as the Assistant Director of Training and Quality Assurance before being promoted to Clinical Director of ABACA's Nashua, New Hampshire, and Portsmouth, New Hampshire, locations. While she was Clinical Director, Morton supervised approximately thirteen other Board-Certified Behavior Analysts.

60. According to Morton, every patient at ABACA was categorized based on how much their insurance reimbursed, from "Super Payors," also called "Scholarship Providers," to "Mid Payors" and "Scholarship" clients. BARNETT created the guidance that established which patient would be in which category.

61. At a certain point, Morton was "demoted" to "concierge BCBA," meaning that her entire role was devoted to the care of a single patient, who had the highest reimbursement rate among ABACA's clients. ABACA was reimbursed approximately $328 for every fifteen minutes that Morton spent with that client (or $1,312 per hour). BARNETT frequently discussed Morton's treatment of that patient, "track[ing] dollar by dollar, line by line." The patient was prescribed forty hours of applied behavior analysis therapy per week (which would be approximately $52,480 per week), which Morton felt was appropriate given how aggressive the patient was. Morton felt that there was a "grey area," however, when the patient was at school or taking a nap in which she was unsure that her work qualified as treatment. If Morton or others failed to meet those forty hours a week, BARNETT was upset.

62. According to Morton, HOLZUM called poor-performing employees "bottom feeders," such that employees were either a "high high" or a "bottom feeder."

63. ABACA patients would have their treatment plans amended in order to increase the amount of service hours billed, without the knowledge of the patient's family or even the ABACA employee providing the therapy.

64. According to Morton, ABACA intentionally mispresented the place of service for clients that received services in Massachusetts, reporting that the services had allegedly been provided in New Hampshire, in order to get a higher reimbursement rate. ABACA had a map of patients that indicated the closest New Hampshire location for billing purposes. Additionally,

ABACA maintained a Key Performance Indicator sheet that tracked treatment hours and was sent to employees by ABACA Executive Directors.

**F. Dariya Yudina,[2] ABACA Clinical Director**

65. On October 31, 2024, and November 25, 2024, the government interviewed Dariya Yudina ("Yudina"), who has worked in the applied-behavioral-analysis field since approximately 2007, possessing a master's degree in mental health counseling from Boston College and a second master's degree in applied behavioral analysis from Simmons University.

66. Yudina worked at ABACA as a Clinical Director from August 2021 through September 2022, before being promoted to Regional Director from September 2022 through November 2022. During Yudina's time at ABACA, she was involved in numerous ABACA clinic locations across New Hampshire and Massachusetts.

67. According to Yudina, ABACA, through a directive from BARNETT, required its clinicians to sign a form that de-credentialed them with insurance carriers. The purpose of this practice was to force insurance carriers to pay higher out-of-network reimbursement rates to ABACA. If the clinician refused to sign the form, they quit or were fired. Later in her employment, Yudina was directed to prevent therapists from signing credentialing forms, which prevented those therapists from becoming in-network with insurance carriers.

68. In order to make these out-of-network services appear medically necessary, ABACA, through the directive of BARNETT, sought to obtain single-case agreements with insurance carriers. ABACA instructed clients' parents to contact an in-network provider and ask whether the provider had a waitlist. ABACA then contacted the clients' insurance carriers to report

---

[2] Yudina is currently represented by plaintiff's counsel in a lawsuit against ABACA for failure to timely pay all wages owed to her.

that the clients needed applied behavioral analysis, but that their in-network providers had waitlists. ABACA told the carrier that they did not have a waitlist and could provide services immediately, citing consistent staffing and therapy services to justify their expensive out-of-network rate. Additionally, ABACA falsely represented that services were provided in New Hampshire, because insurance carriers provided a higher out-of-network reimbursement rate for services in New Hampshire.

69. Yudina said that ABACA, through the directive of BARNETT, categorized minor clients into one of the following categories based on the reimbursement rate ABACA earned from the client's insurance: "Super Payors," "Mid Payors," and "Scholarship Payors." Clients within the "Super Payors" category were placed there because ABACA was reimbursed for more than 80% of the services billed and, as a result, these patients were provided more experienced ABACA clinicians, more therapy treatment, and more support and leniency. Clients within the "Mid Payors" category were placed there because ABACA was reimbursed for between 60% to 80% of the services billed. Patients within the "Scholarship Payors" category were placed there because ABACA was reimbursed for less than 50% of the services billed. As a result "Scholarship Payors" were provided fewer resources, less leniency, and fewer opportunities to complete the number of therapy hours detailed in their contracts with ABACA. If clients failed to complete the number of therapy hours in their ABACA contracts, then they were billed or were dismissed from treatment.

70. Yudina believed that ABACA's goal was to bill for as many therapy hours as possible, regardless of medical necessity.

### G. Leanne Sanchez, ABACA Director of Operations

71. On January 3, 2025, Leanne Sanchez ("Sanchez") was interviewed by the government. Sanchez was a Client Coordinator at ABACA from April 2022 through December

2022, before being promoted to Director of Operations at ABACA's Peabody, Massachusetts, location.

72. During her employment with ABACA, Sanchez was tasked with creating a spreadsheet to track and compare the number of treatment hours prescribed to children that were treated at the Peabody location with the number of treatment hours that ABACA employees actually rendered. This spreadsheet was closely monitored by BARNETT.

73. ABACA created a separate, color-coded spreadsheet that denoted each child's health insurance plan. The color red denoted "scholarship" patients; the color yellow denoted "middle" patients; and the color green signified "non-scholarship" patients. ABACA staff internally shared this spreadsheet weekly through email and Microsoft Teams.

74. BARNETT and Kyle Berk ("Berk"), Executive Director of ABACA's location in Peabody, Massachusetts, forced ABACA employees to deduct therapy services from "scholarship" clients whose insurance did not pay well and to instead provide the therapy services to children whose insurances paid well.

**H. Haley King, ABACA Assistant Clinical Director**

75. On March 2, 2025, the government interviewed Haley King ("King"). King worked as a BCBA and Assistant Clinical Director at ABACA from May 2022 until she was fired in March 2024. Prior to starting with ABACA, King was credentialed with BlueCross BlueShield of Massachusetts. When she started with ABACA, she brought a few patients with her from a prior practice. The Executive Director of ABACA's Nashua, New Hampshire, location informed King that those patients would be transferred to another clinician, who was not credentialed with BlueCross BlueShield.

76. King received emails from ABACA's utilization review department, requesting that her clients be prescribed more treatment hours than what had initially been approved. According to King, someone "would sign her name without her knowledge, consent, or clinical reference."

77. King confirmed that ABACA maintained a color-coded list of patients, based on how much the client's insurance reimbursed. If King was assessing a "Super Payor," then a member of ABACA's assessment team would come to an initial evaluation or re-authorization, to ensure that King recommended forty hours of ABA services per week. According to King, it was a common occurrence that she would want to lower a patient's hours, but the assessment team would decline, recommending that the child continue to receive between thirty-five and forty hours per week.

78. ABACA assigned BlueCross BlueShield patients in Massachusetts to New Hampshire and instructed employees not to list the full address for the place of service, and instead to choose from general categories like "home," "school," or "community." When the company received pushback for providing services in schools, employees were instructed to choose "community" for services offered in schools.

79. Clients received checks directly from their insurance carriers, which they would then provide to King. King remembered being handed checks for approximately $60,000.

80. BARNETT paid "spot bonuses," based on how much the ABACA employee billed. King believes that she received six bonuses from BARNETT during her time with ABACA, ranging from $1,000 to $2,500. King was told by BARNETT, HOLZUM, and Ed McDonough (ABACA's Regional Director of Operations for the northeast region, who is associated with some of the SUBJECT ACCOUNTS) that the bonuses were based on billing. King was identified as a

"high, high" at the company, an internal term used to identify employees that billed a high number of hours each week. BARNETT and HOLZUM referred to other employees as "bottom feeders."

**I. Glenna Magowan,[3] ABACA Board-Certified Behavior Analyst**

81. On November 25, 2024, the government interviewed Glenna Magowan ("Magowan"), who holds a master's degree in both applied behavioral analysis and severe special education. Magowan worked at ABACA as a Board-Certified Behavioral Analyst from January 2022 through January 2023. Prior to Magowan's employment with ABACA, she was credentialed as an in-network provider with several insurance companies. After she was hired by ABACA, however, Magowan was instructed by ABACA to sign a document that de-credentialed her with those insurance carriers.

82. BARNETT informed Magowan about ABACA's practice of categorizing minor clients based on their insurance reimbursement rates. BARNETT described the practice as a business model which allowed ABACA to prioritize the care of its "Super Payor" clients and provide them all of the authorized therapy hours in order to then accept more "Scholarship Payor" clients. If a client or family was unable to accommodate all of the authorized therapy hours, ABACA dismissed them.

83. According to Magowan, toward the end of her employment with ABACA most clients received treatment plans from ABACA that prescribed medically unnecessary therapy hours. Magowan recalled two minor patients that she and another ABACA clinician were asked to assess. Magowan recommended that the minor patients receive 24 hours of therapy per week. The other clinician recommended 40 hours. Magowan was forced by an ABACA chief clinical

[3] Magowan is currently represented by plaintiff's counsel in a lawsuit against ABACA for failure to timely pay all wages owed to her.

officer[4] to modify her recommendation in order to reflect the higher number of therapy hours per week.

84. Magowan believed that ABACA focused on billing as many therapy hours as possible, rather than billing therapy hours that were medically necessary. ABACA paid bonuses to employees when their clinic surpassed billing a certain number of hours. If clinicians did not accomplish their billable hours, they were referred to as "low performers" or "bottom feeders."

**J. Alyssa Duncan, ABACA Board-Certified Behavior Analyst**

85. On December 17, 2024, the government interviewed Alyssa Duncan ("Duncan"), who worked as a Board-Certified Behavior Analyst at ABACA from September 2022 through September 2023. At the beginning of her employment with ABACA, Duncan assisted with the initial assessment of patients. After she worked at ABACA for approximately six months, however, ABACA created a separate clinical intake team to conduct initial assessments, because Duncan and other therapists were not prescribing sufficient treatment hours to patients.[5]

86. Duncan believed that the number of treatment hours prescribed by ABACA was excessive and medically unnecessary. Staff struggled to provide the increasingly high number of patient treatment hours prescribed by ABACA, which caused a "revolving door" of caregivers, causing a disruption of continuity of care. Furthermore, ABACA's practice of increasing patient

---

[4] Based on our investigation, I believe that this likely refers to Emily Santagati, who was previously ABACA's Chief Clinical Officer before becoming the Vice President of Clinical Services, and is associated with some of the SUBJECT ACCOUNTS.

[5] Based on the other interviews, I believe that this other clinical intake team is the same assessment team run by Quatiba Davis (who is associated with some of the SUBJECT ACCOUNTS) in Florida and referenced by Christina Peddlar, who believed that "the assessment team was there to prescribe the most hours."

treatment hours failed to consider the patients' time in school or treatment from other clinicians, such as occupational therapists.

87. Duncan was motivated to work at ABACA because they offered a higher pay than most applied behavioral analysis clinics. Additionally, ABACA provided incentives and bonuses to their employees based on the number of treatment hours billed. Duncan believed that ABACA prioritized billing insurance and achieving higher billable hours for patients. She explained, "It was like a sport when the coach was obsessed with winning: 'Hit your numbers. Hit your hours. Bill, bill, bill.'"

**K. Michelle Couture, ABACA Board-Certified Behavior Analyst**

88. On February 28, 2025, the government interviewed Michelle Couture. ("Couture"). Couture has been a BCBA since 2019 and started with ABACA in May 2022. At one point during her tenure with ABACA, she was made the clinical director of ABACA's "Peabody location" for three weeks. However, at the time, the company did not have an office in Peabody, Massachusetts.

89. At one point, BARNETT called Couture and told her that she was the kind of employee that he valued because she billed forty hours in a single week and that she would be receiving a bonus. She later received a check for $2,500. BARNETT also gave Couture a Cartier pen.

90. Couture recalled a meeting in which HOLZUM discussed "Super Payors," also called "Scholarship Providers" because reimbursements from servicing these clients funded services for those internally referred to as "Scholarship Patients." HOLZUM informed the group that if a "scholarship patient," that is someone whose insurance did not reimburse at a high rate, could not meet their full treatment hours, then they should be discharged. When Couture asked why they would not discharge "Super Payors" or "Scholarship Providers," HOLZUM called

Couture a "bottom feeder" for making the comment. Couture remembered BARNETT giving a similar presentation to ABACA employees. If an employee was unavailable to offer services to a "Super Payor," then staff would be reassigned from a "Scholarship Patient."

91. According to Couture, non-clinical staff would question the hours that she prescribed to her clients, with a lot of clinicians "just putting 25 hours as a sort of blanket rule" when performing an evaluation. HOLZUM said that 25 hours per week was the target number to prescribe.

92. ABACA did not collect copays from their clients. In one instance, however, when a parent tried to discontinue ABACA services during the summer months, ABACA employees warned the parent that, if she discontinued ABACA services, then the company would recoup all the copays that were otherwise waived.

**L. Stephanie Norris, ABACA Board-Certified Behavior Analyst**

93. On August 29, 2025, the government interviewed Stephanie Norris. Norris started working at ABACA in approximately October 2022 as a BCBA. Prior to working at ABACA. Norris had been in-network with a number of insurance companies including Massachusetts Medicaid, Blue Cross Blue Shield, Harvard Pilgrim, Aetna, Cigna and Tufts.

94. According to Norris, ABACA had "Scholarship Provider" patients, also called Super Payors, whose insurance paid much more than other clients. She described ABACA as "catering to" Scholarship Providers. If an employee assigned to a Scholarship Provider called out sick, then ABACA would cancel services for other patients in order to prioritize seeing the Scholarship Provider. "The company would do anything to keep these scholarship providers happy so they could continue to bill their insurance," including having ABACA employee doing the family's dishes.

95. When Norris first started with ABACA, the BCBA assigned to a case would perform an initial assessment and develop a treatment plan. Eventually, however, ABACA created its own assessment team led by Quatiba Davis (who is associated with some of the SUBJECT ACCOUNTS). That team would then develop the treatment plan. Norris said that "[s]ometimes the amount of hours and goals they [the assessment team] had written were not appropriate." Norris gave the example of a client only needing 15 to 20 hours of therapy per week, but ABACA prescribing 35 hours of therapy because the client was a Scholarship Provider. Norris described instances in which the assessment team included the same goal written multiple times in different ways in order to justify the treatment hours.

96. Although Norris worked in the ABACA location in Nashua, NH, ABACA would assign her to clients throughout Massachusetts. She explained that "some insurances reimbursed higher rates in New Hampshire," so if ABACA "could bill out through New Hampshire, it would be better."

97. ABACA additionally did not adhere to the number of hours that were authorized by insurers. If, for example, a client was a Scholarship Provider who received prior authorization for twenty hours of ABA therapy per week, then ABACA would over-schedule the patient for thirty-five hours per week, meaning that the prior authorization would run out of funding and ABACA would have to request additional funding from the insurer. Consequently there were instances in which ABACA would "run out of hours" for patients.

98. BARNETT and HOLZUM[6] traveled to the New Hampshire locations to discuss billing and productivity. ABACA employees were expected to bill 28 hours of ABA therapy per

---

[6] Norris did not remember HOLZUM's last name, but identified him as Mike H, who was a "higher-up" at the company.

week. Employees who exceeded that expectation received bonuses. Norris believes that she received a bonus for $2,000.

**M. Christine Ohrenberger, ABACA Board-Certified Behavior Analyst**

99. On October 8, 2025, the government interviewed Christine Ohrenberger. Ohrenberger was a BCBA at ABACA from May 2022 until April 2023. According to Ohrenberger, ABACA internally referred to clients whose insurance reimbursed at a higher rate as "Super Payors," later changing the name to "Scholarship Providers." BARNETT told Ohrenberger that you "could not cancel services for scholarship providers" because "their reimbursement was going to fund services for scholarship clients." Ohrenberger had a Scholarship Provider and was told to "cancel services for someone who had higher needs and was a scholarship client in order to provide services to this scholarship provider." According to Ohrenberger, clinicians at ABACA were "always told to prioritize scholarship providers no matter what."

100. Any patient that was insured through BlueCross BlueShield of Massachusetts was billed out of the ABACA clinic in Salem, New Hampshire. At the time, ABACA did not even have an office in Salem, New Hampshire. Even if ABACA had staff in Massachusetts that could provide services, the client was transferred to a BCBA assigned to the New Hampshire facility, even if the client actually received services in Massachusetts. Ohrenberger believed that there would be insurance claims submitted by ABACA in which the client was in Braintree, Massachusetts, but the service provider was listed as being in Salem, New Hampshire.

101. Although she initially performed her own assessments, ABACA formed an assessment team led by Quatiba Davis (who is associated with some of the SUBJECT ACCOUNTS). According to Ohrenberger, when she, the assessor, and an RBT went to a client's home, she was told to bill her time for "protocol modification" (97155), while the assessor would

bill for the assessment (97151), and the RBT would bill for direct therapy (97153). Ohrenberger "didn't feel comfortable" billing her time as protocol modification because she was doing an assessment while the person from the assessment team "didn't do anything that qualified to be billed." Similarly, when providing direct-service support to clients, Ohrenberger was required to say who was present at a session, including the client's parents. If the parents were present, Ohrenberger was told to change the billing code to parent training. Ohrenberger said that this did not qualify as parent training.

102. ABACA implemented a policy whereby RBTs would have to go part-time if they did not meet the minimum numbers of hours. ABACA required that RBTs have 25 client-facing hours per week, which then increased to 27 hours, and finally to 32 hours while she was at the company. Employees were given bonuses if they met or exceeded the requirement. HOLZUM and "anyone in the C-Suite" would refer to employees as "high, highs" if they exceeded the hours expectation. Ohrenberger was a "high, high" and was invited to a suite at a Red Sox game and a bonus dinner.

103. On April 3, 2023, Ohrenberger emailed ABA Ethics Hotline to say, "I am wondering if it is ethical to bill a unit of direct services (97153) from your car when you are not with the client. My RBTs are being instructed to bill an additional unit to write their session notes from their car after the session has ended. I know 97153 requires the service to be face-to-face so I am wondering if billing without the client present violates this code." In response, she was told, "It is non-compliant to bill any units for writing session notes whether the RBT remains in the home or in their car. Session notes are part of the bundled fee that is received for the direct therapy." She was further instructed that she had "an obligation to at least put your concerns about

this fraudulent, unethical conduct into writing to the clinical director and/or the owner of the company.

104. When Ohrenberger put in her notice, HOLZUM called her, saying that he had heard that "one of his high, highs was leaving." Ohrenberger told HOLZUM that she was uncomfortable with the assessment team, the minimum number of hours, and that she had "ethical concerns about billing."

**N. Bailey Carr, ABACA Board-Certified Behavior Analyst**

105. On October 14, 2025, the government interviewed Bailey Carr. Carr started at ABACA as a BCBA in summer 2022. Before starting at ABACA, Carr was credentialed with most major health insurers, including MassHealth. Carr was assigned to the ABACA clinic in Salem, New Hampshire, despite the fact that she did not work in New Hampshire and actually saw all of her clients on the South Shore of Massachusetts, including Rehoboth, Quincy, Brockton, Abington, and Braintree. Carr never visited the Salem, New Hampshire, location.

106. When Carr started at ABACA, the company had a goal for BCBAs to "hit" twenty billable hours per week, which was eventually increased to twenty-seven hours. ABACA categorized clients based on insurance reimbursement, including by sharing spreadsheets with clinicians to show how much insurers reimbursed for each client. RBTs were told to prioritize "scholarship providers."

107. ABACA had a practice of providing excess hours to patients, beyond what had been approved by insurance carriers, in order to maximize the amount that the company billed. This resulted in ABACA using all of the approved treatment hours. Carr was then asked to write clinical rationales, justifying why ABACA needed additional hours.

108. In September 2022, BARNETT met with all of the BCBAs at ABACA's office in Braintree, Massachusetts, to explain "the model of the company." BARNETT explained that the average reimbursement from insurance for ABA services was between $100 and $150, but that ABACA was asking for, on average, over $300 for all providers. BARNETT said the company would create an assessment team who would handle all assessments, so that the treatment team would no longer assess clients. Carr told BARNETT that she did not want anyone else to do her assessments and did not feel confident in having someone else, who did not know her clients, perform the assessment. ABACA sent members of the assessment team to accompany her while she conducted assessments, but only for "super payor" client assessments. Carr summarized that "someone from the assessment team would come to observe her only if the client had high reimbursing insurance." The person from the assessment team "intervened and said the client needed more hours." Carr told her clinical director that she did not feel comfortable with the new practice and said that she "wasn't comfortable with them using her name."

109. Carr later saw assessments performed by the assessment team. In one instance, Carr was asked to cover a client who did not have a permanent BCBA. Carr found that the goals identified by the assessment team did not match with the client's skill set. For example, the client was a teenager, but the goals listed in the treatment plan were "juvenile" and not age appropriate. Carr believed that the client needed five or six hours of ABA therapy per week, plus parent training. The assessment team, however, prescribed fifteen hours per week. This was the "final straw" for Carr, who felt that she "couldn't keep jeopardizing her license."

110. Carr was very vocal about her concerns, including with HOLZUM. In December 2022, Carr attended a meeting hosted by HOLZUM, who explained that the company needed to grow faster and bill more. When clinical staff pushed back, saying that "kids need to be kids still"

and therefore certain hour goals might not be appropriate, HOLZUM "aggressively said that was a stupid thing to say." ABACA then began tracking key performance indicators and providing bonuses to staff to hit the target number, which included hours of treatment. Carr felt that they were "pushing clinicians to bill hours that were not appropriate."

111. Shortly before Carr left ABACA, her clinical director sent all clinicians "assigned" to the Salem location to stay an extra fifteen minutes after each treatment session in order to write their notes and "bill for it." Carr told her staff not to do this.

**O. Liana Bolen, ABACA Board-Certified Behavior Analyst**

112. On October 22, 2025, the government interviewed Liana Bolen. Bolen worked as a BCBA at ABACA from approximately May 2022 through May 2023. Bolen left the company because she felt like the company was primarily focused on "super payors" and was not listening to clinical staff. She described the company as "glorified daycare."

113. Although Bolen was based in Braintree, Massachusetts, ABACA listed her out of Salem, New Hampshire. She was later told by her supervisor that ABACA did this so that they could bill out of New Hampshire for out-of-network status. Her supervisor said that the directive came from a large meeting with higher-level staff.

114. Bolen had one client who received between six and nine hours of ABA therapy per week. Because the client was a "super payor," however, Bolen was told that a member of the assessment team would be visiting to ensure that the correct number of hours were prescribed. According to Bolen, ABACA "loved anything" with more than thirty-five hours of treatment, even when it was not medically necessary. Bolen told ABACA staff that she would not request hours that she did not need. However, ABACA employees would go behind her back and speak directly with families, asking if they wanted more hours.

115. Bolen caught ABACA employee Sarah Glidden (who is associated with some of the SUBJECT ACCOUNTS), who did not have clinical training, changing Bolen's treatment plans to recommend more hours. Bolen then began submitting her treatment plans as .pdfs to prevent unauthorized changes.[7]

116. HOLZUM addressed ABACA staff at all-employee meetings, saying that the company should "do anything for" "super payor" clients. HOLZUM emphasized the importance of retaining "super payors," providing bonuses for meeting and exceeding certain billable target hours. Bolen believed that was why the assessment team was created, to prescribe more hours, even when clinically inappropriate. According to Bolen, the assessment team worked off of assessments that "had already been written," such as copying and pasting from a template that included a bank of treatment goals, and included goals that were clinically inappropriate, such as a nonverbal client speaking in two-to-three sentence phrases within six months.

## II. <u>Interviews with the Parents of ABACA Clients</u>

### A. Ann Marie Stackhouse

117. On November 22, 2024, Ann Marie Stackhouse was interviewed by the government. Ann Marie Stackhouse is the parent of a minor diagnosed with autism who received applied behavior analysis from ABACA. When they began treatment with ABACA, the child was prescribed between twenty-five and thirty-six hours of therapy per week, in addition to one hour per week of parental training for Ms. Stackhouse.

118. Ms. Stackhouse reviewed ABACA's contract of care plan for her child and determined that ABACA inaccurately detailed that her child could not perform several activities that her child could, in fact, perform. Ms. Stackhouse believed that ABACA intentionally

---

[7] Glidden is now a Vice President of ABA Centers of America, based in Nashua, New Hampshire.

mischaracterized her child's limitations as more severe in order to justify the number of therapy hours that ABACA prescribed. When Ms. Stackhouse disputed and confronted ABACA's inaccuracies and attempts to add additional therapy hours to her child's plan, ABACA told her, "We cannot accommodate that little amount of hours."

119. Ms. Stackhouse installed a camera in her child's bedroom to monitor the child. During one of the child's therapy sessions, she witnessed the ABACA employee typing on his cell phone for the entirety of the session.

**B. Todd Kulaga**

120. On December 13, 2024, Todd Kulaga was interviewed by the government. Mr. Kulaga's child is a minor diagnosed with autism who received applied behavior analysis from ABACA.

121. According to Mr. Kulaga, his child received treatment from between ten and twelve different clinicians while receiving treatment from ABACA. Mr. Kulaga described these ABACA employees as young, with no formal education. Mr. Kulaga explained, "they came and went like McDonald's employees." Mr. Kulaga saw many of these ABACA employees preoccupied on their phones while they were allegedly providing therapy to his child.

122. During ABACA's initial assessment of his child, ABACA employees asked Mr. Kulaga and his spouse how much they could afford to pay. After Mr. Kulaga told ABACA that he could afford $25 per month, that became the amount that ABACA charged his family every month for their copayment.

123. Mr. Kulaga believed that his family was exploited by ABACA, who knew that his family was vulnerable because their child had recently been diagnosed with autism and consequently the family did not know how to navigate applied behavior analysis services.

124. Mr. Kulaga's family has healthcare coverage benefits through BlueCross BlueShield of Massachusetts. A review of his child's healthcare claims for services rendered by ABACA revealed that ABACA billed BlueCross BlueShield of Massachusetts $485,835.00 for approximately four months of applied behavior analysis for Mr. Kulaga's child. BCBS Massachusetts reimbursed ABACA $482,618.76 for those services.

125. ABACA also submitted claims to Anthem—BlueCross BlueShield of New Hampshire for services purportedly provided to his child by ABACA's New Hampshire clinicians. Between October 2022 and June 2023, ABACA billed Anthem—BlueCross BlueShield of New Hampshire $1,038,315 and was paid $46,879.

126. On November 29, 2022, BARNETT was emailed a list of client "families who have checks in hand" as well as checks that had been received by ABACA employees from client families. According to that email, Kulaga's family provided a $5,000 check to ABACA employees who had the check "in hand."

## III. Interviews with Private Insurance Carriers

### A. Mindy Dummerth, Cigna Healthcare Investigator

127. On December 6, 2024, the government spoke with employees from Cigna Healthcare regarding claims for services that the insurance carrier had received from ABACA. Mindy Dummerth, an investigator with Cigna Healthcare, reported the following information related to Ms. Dummerth's investigation of ABACA.

128. ABACA frequently requests to initiate single-case agreements with Cigna customers. From January 1, 2022, through the date of the government's interview, Cigna's commercial healthcare insurance was billed $119,134,616 by ABACA and paid ABACA $26,548,370.

129. Through the course of Cigna Healthcare's investigation, Cigna obtained and reviewed records from ABACA and found that ABACA's medical records lacked proper information to justify the billings. Specifically, the records failed to identify the clinicians that purportedly rendered services and failed to document the number of service units (that is, time increments of therapy) provided. Additionally, ABACA engaged in fee-forgiveness with patients, that is, waiving an insurance beneficiary's co-pay or co-insurance. Cigna was concerned by ABACA's fee-forgiveness because it potentially incentivized patients to seek treatment from ABACA rather than other providers who appropriately charge fees from the patients.

130. From my training and experience, I know that it can be a red flag of medically unnecessary billing when a provider waives a patient's out-of-pocket costs, such as co-pay or co-insurance payments, because it removes the patient's incentive to ensure that the provider is not billing for medically unnecessary services or services not rendered. Additionally, the practice to waive patients' out-of-pocket costs incentivizes patients to seek services only from that provider.

**B. Dr. Jessica Everett, BlueCross BlueShield of Massachusetts Clinical Director**

131. On December 9, 2024, the government interviewed Dr. Jessica Everett, a Clinical Director of Autism, Applied Behavior Analysis, and Neurodevelopment with BlueCross BlueShield of Massachusetts. Among other duties, Dr. Everett clinically evaluates applied behavior analysis service requests from providers submitted to BlueCross BlueShield of Massachusetts.

132. According to Dr. Everett, ABACA is an out-of-network provider for BlueCross BlueShield of Massachusetts. Generally, BlueCross BlueShield of Massachusetts does not engage in single-case agreements. Nevertheless, ABACA submits requests to BlueCross BlueShield of Massachusetts to initiate single-case agreements for patients with BlueCross BlueShield of

Massachusetts health maintenance organization ("HMO") plans. For patients with BlueCross BlueShield of Massachusetts' preferred provider organization ("PPO") plans, ABACA requests to be reimbursed at their rates, which are significantly higher than BlueCross BlueShield of Massachusetts' in-network provider rates. For example, BlueCross BlueShield of Massachusetts' in-network provider rate is approximately $30 per unit for current procedural terminology (CPT) code 97151, the code used to bill for fifteen-minute increments of adaptive behavior assessment (meaning a one-hour session might be billed as $120 for four units of therapy). However, ABACA charges BlueCross BlueShield of Massachusetts approximately $200 per unit for CPT code 97151 (meaning that a one-hour session might be billed as $800 for four units of therapy). In addition to charging $170 more for each therapy unit billed, ABACA also requests a higher number of units for CPT Code 97151 than most providers that submit reimbursement requests to BlueCross BlueShield of Massachusetts.

133. BlueCross BlueShield of Massachusetts has been contacted by patients with PPO plans to report that ABACA informed them they are unable to provide treatment when single-case agreements are not granted. BlueCross BlueShield of Massachusetts patients reported to Dr. Everett that ABACA calls BlueCross BlueShield of Massachusetts' in-network ABA therapy providers to inquire about their availability.

## IV. <u>Claims Data</u>

134. The government has received claims data for ABACA claims submitted to Aetna, Anthem, BlueCross BlueShield, Cigna, Optum, Point32, and United Healthcare; all of these insurances' commercial plans were billed by ABACA and some of these insurances' government-funded plans were billed by ABACA. According to the claims data provided by those private

insurers, ABACA billed approximately $1,566,272,110 and was paid approximately $369,931,020.

135. Including BARNETT's other ABA companies, such as entities operating in Florida, Georgia, New Jersey, Pennsylvania, Tennessee, and Virginia, the companies have billed over $2.4 billion and have been reimbursed over $480 million.

## V. BARNETT's Use of Fraud Proceeds to Purchase Assets

136. After receiving the funds from billing for medically unnecessary ABA services based on what a client's insurer would reimburse and manipulating the records, including place of service, in order to ensure the maximum reimbursement, BARNETT used the funds to support a lavish lifestyle, including luxury purchases like a private plane, a fleet of rare and expensive vehicles, and to lease a waterfront home valued at nearly $20 million in Fort Lauderdale, Florida.

137. On November 5, 2024, BARNETT signed an agreement on behalf of Agile Enterprise Leasing LLC (one of BARNETT's companies) with Twenty X LLC to purchase a Bombardier Inc. model BD-700-1A10 aircraft for the purchase price of $9,950,000.00.

## Probable Cause to Believe that Evidence of the TARGET OFFENSES Will Be Found in the SUBJECT ACCOUNTS

## I. Background on Microsoft Accounts

138. In my training and experience and open resources, I have learned that Microsoft provides a variety of online services, including electronic mail ("email") access, to the public. Subscribers may obtain email accounts from Microsoft at the domain name "[company].com." For enterprise Office 365 accounts, as previously described, Microsoft allows subscribers to use a custom domain name for their email services. Subscribers obtain an account by registering with Microsoft. During the registration process, Microsoft asks subscribers to provide basic personal information. Therefore, the computers of Microsoft are likely to contain stored electronic

communications (including retrieved and unretrieved email for Microsoft subscribers) and information concerning subscribers and their use of Microsoft services, such as account access information, email transaction information, and account application information.

139. A Microsoft subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), OneDrive files, and other files, on servers maintained and/or owned by Microsoft. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, OneDrive files, email in the account, and attachments to emails, including pictures and files.

140. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that, even if subscribers insert false information to conceal their identities, this information often provides clues to their identity, location, or illicit activities.

141. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as

logging into the account via the provider's website), and other log files that reflect usage of the account. I also know that Microsoft typically maintains detailed audit logs of actions taken in the Office 365 and Azure AD environments. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

142. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

143. Information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who

used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the IP addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

144. In my training and experience and from open resources, I have learned that Microsoft provides a variety of online services, including electronic mail ("email") access, to the public. These public accounts allow subscribers to send, receive, and store emails online. Microsoft allows subscribers to obtain email accounts and create their own domain names such as @icbdholdings.com, like the email accounts listed in Attachment A.

145. During the registration process, Microsoft asks subscribers to create a username and password, and to provide basic personal information. Microsoft typically does not verify the subscriber names; however, Microsoft does typically verify the email address or phone number provided. Therefore, the computers of Microsoft are likely to contain stored electronic

communications (including retrieved and unretrieved e-mail for Microsoft subscribers) and information concerning subscribers and their use of Microsoft services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation, because the information can be used to identify the account's user or users.

146. In my training and experience, I have also learned that email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

147. Once a subscriber has registered an account, Microsoft provides email services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. Microsoft subscribers can also use that same username or account in connection with other services provided by Microsoft.

148. A subscriber's Microsoft account can be used not only for email, but also for other types of electronic communication, including instant messaging, photo and video sharing, voice calls, video chats, and SMS text messaging. Depending on user settings, user-generated content derived from many of these services is normally stored on Microsoft's servers until deleted by the subscriber. Similar to emails, such user-generated content can remain on Microsoft's servers indefinitely if not deleted by the subscriber, and, even after being deleted, it may continue to be

available on Microsoft's servers for a certain period of time. Furthermore, a Microsoft subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on Microsoft's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a Microsoft account may be found within such computer files and other information created or stored by the Microsoft subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

149. Based on my training and experience, I know that providers such as Microsoft also collect information relating to the devices used to access a subscriber's account, such as laptop or desktop computers, cellular phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Microsoft in order to track what devices are using Microsoft's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Microsoft accounts created or accessed by the same device and likely belonging to the same user; (b) to find other types of accounts linked to the same device and user; and (c) to determine whether a particular device recovered during the course of the investigation was used to access the Microsoft account.

150. Based on my training and experience and from open resources, I know that providers such as Microsoft use cookies and similar technologies to track users visiting Microsoft's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Microsoft. More sophisticated cookie technology can be used to identify users across devices and web browsers. From my training and experience, I know that cookies and similar technology used by providers such as Microsoft may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Microsoft account and determine the scope of criminal activity.

151. Based on my training and experience, I know that Microsoft maintains records that can link different Microsoft accounts to one another, by virtue of common identifiers, such as common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Microsoft accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who used a particular Microsoft account.

152. In summary, based on my training and experience in this context, I believe that the computers of Microsoft are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved email), as well as Microsoft-generated information about its subscribers and their use of Microsoft services and other online services. In

my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide Microsoft with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

## II. Probable Cause As to Each of the Specific Subject Accounts

153. On February 20, 2025, the Honorable Andrea K. Johnstone, United States Magistrate Judge for the District of New Hampshire, issued a search warrant which allowed the Government to search and seize BARNETT's Microsoft OneDrive account. According to emails obtained from that warrant, BARNETT's email communication with HOLZUM, ABACA employees, and others corroborate the witness statements discussed thus far.

154. The following email exchanges, from the Subject Accounts associated with BARNETT provide probable cause to believe that evidence of the TARGET OFFENSES will be located within the SUBJECT ACCOUNTS.

### A. Emily Santagati Accounts

155. Emily Santagati is ABACA's Vice President of Clinical Services. She previously worked as the company's Chief Clinical Officer. Based on a review of emails sent to and from BARNETT obtained via a search warrant on his OneDrive account, it appears that Santagati was responsible for tracking the provision of treatment hours and encouraging her staff to increase treatment hours in treatment plans.

156. According to the previously discussed statements from Glenna Magowan, a former BCBA with ABACA, Emily Santagati forced her to modify her treatment plan recommendations in order to include more treatment hours. Additionally, according to Larissa Fedak, Santagati knew that ABACA was intentionally billing for services out of New Hampshire, despite the fact that

services had not actually been rendered there, because insurers paid a higher rate of reimbursement based on that place of service.

157. On March 30, 2022, BARNETT (via Subject Account cbarnett@icbdholdings.com) scheduled a meeting regarding a "Clinical [Key Performance Indicator] Report" for ABACA's location in Wellesley, Massachusetts, and invited Emily Santagati (via Subject Account esantagati@abacenters.com) and HOLZUM (via Subject Account mholzum@icbdholings.com). He advised Santagati, "the numbers look really good on your end. I do want to drill in to Tx [Treatment] plan hours. We need to push that number up. Be prepared with Tx plan level data for our meeting. Review all of the new ones and make sure there isn't room for increase. It may make sense for you to review all of the Tx plans prior to submission for the centers that are struggling to bring their numbers up?"

158. In response to that invitation, Santagati wrote (from Subject Account esantagati@abacenters.com) to BARNETT (at Subject Account cbarnett@icbdholdings.com) and CC'ed HOLZUM (via Subject Account mholzum@icbdholdings.com). Santagati explained that, "In the past few weeks all BCBAs started to use the clinical prescription tool that Brian created to help BCBAs make appropriate treatment plan hour recommendations. When treatment plans come through, it goes through the clinical director and is then submitted. *I review each plan once it's submitted* and *if it's a low number of hours*, I call the clinical director and *ask them clinical justification for low hours*. If the justification isn't sufficient, I'll have clinicians go back out to re-assess to see if the client requires a higher number of hours. (emphasis added)"

159. On April 21, 2022, BARNETT (from Subject Account cbarnett@icbdholdings.com) emailed Emily Santagati (at Subject Account esantagati@abacenters.com), Steve Del Mauro (at Subject Account

sdelmauro@icbdholdings.com), Javier Cabrera (at Subject Account jcabrera@icbdholdings.com), and Sarah Glidden (at Subject Account sglidden@abacenters.com) with the subject line "new super payer – [Client Name]." BARNETT explained that there was a "new super payer" in the census saying, "We should be getting our first reimbursements in next week but they are statusing her claims and they are coming back as a superpayer." He then asked Santagati, "Emily – please do a Tx plan [Treatment Plan] audit ASAP." Santagati responded to BARNETT with her review of the treatment plan. BARNETT asked why they were only prescribing 1 hour of parent training. When Santagati explained why, BARNETT asked, "why not shoot for more?" and included the Subject Accounts associated with Steve Del Mauro, Sarah Glidden, Javier Cabrera.

160. On May 9, 2022, William Klein (from Subject Account wklein@exactbilling.com) emailed BARNETT (at Subject Account cbarnett@icbdholdings.com) and Santagati (at Subject Account esantagati@abacenters.com) regarding "Super Payor Q[uality] A[ssurance]." Klein wrote that he had created a "list of Super Payors, their current recommendations, and then alongside recommendations by UR [Utilization Review, Klein's department]." Klein recommended an increase for every patient, for example, from 10 to 21 hours and from 20 to 40 hours. BARNETT emailed Santagati separately to ask whether she had reviewed the document. Santagati said that she did and that some of the recommendations "are in line with my original recommendations, some are new and I'm willing to explore it, and some I disagree with . . . ."

161. Santagati was additionally included in emails in which ICBD Holdings staff discussed intentionally reassigning clients to new BCBAs in order to remain out of network (despite ABACA having in-network providers on staff). For example, on June 1, 2022, an Exact Billing Solutions employee emailed Santagati (at Subject Account esantagati@abacenters.com) and Javier Cabrera (at Subject Account jcabrera@abacenters.com) with the subject line "Super

Payers List." The Exact Billing employee included a list of clients, by name, who they had identified as "Super Payers." The employee explained that one client "was previously and expected to return to SP [Super Payer] rates with change of BCBA as Kristina C was in network with BCBS MA and adjudicating at a lower rate." Therefore, this employee was emailing Santagati at the Subject Account to discuss intentionally reassigning clients to new BCBAs in order to remain out of network, so that the client could consequently remain a Super Payer. The ABACA employee then forwarded that email to BARNETT (via Subject Account cbarnett@icbdholdings.com) and Ed McDonough (via Subject Account emcdonough@icbdholdings.com).

162. Similarly, on June 20, 2022, BARNETT (from Subject Account cbarnett@icbdholdings.com) emailed an Exact Billing Solutions employee and asked "Where are we on the superpayors that started adjudicating lower? Have we had any success in getting them back up to super payor adjudications? What have we tried?" The employee responded and said that they had tried assigning new BCBAs, as the assigned BCBA had a "contract . . . despite the facility being out of network." BARNETT (from Subject Account cb@icbdholdings.com) replied to the Exact Billing Solutions employee and CC'ed HOLZUM (via Subject Account mholzum@icbdholdings.com), Ed McDonough (via Subject Account emcdonough@abacenters.com), and Santagati (via Subject Account esantagati@abacenters.com). He asked, "Did we move every client off of Christina and on to a new BCBA? If that is the only thing that is working, then we need to do that in the next 48 hours. Please advise." Therefore, BARNETT was including HOLZUM, Santagati, and McDonough in his direction that the company based its assigning of BCBAs on what would ensure that the company remained out of network and received "super payor" reimbursements.

163. Santagati was emailed regarding intentionally billing BlueCross BlueShield of Massachusetts clients out of New Hampshire. On September 19, 2022, Shawn Westberg (from Subject Account swestberg@abacenters.com) emailed Santagati (at Subject Account esantagati@abacenters.com) about "BCBS Massachusetts Client Office Locations" and CC'ed BARNETT (via Subject Account cbarnett@icbdholdings.com), HOLZUM (via Subject Account mholzum@abacenters.com), and Steve Del Mauro (via Subject Account sdelmauro@abacenters.com). Westberg wrote, "I spoke with Chris [BARNETT] today and we discussed the office locations for our BCBS of MA kiddo's [sic], we no longer want Salem [New Hampshire] to get any more of these clients, so we are going to split all of Massachusetts BCBS patients between only Nashua [New Hampshire] and Portsmouth [New Hampshire] if you have a few minutes today to go over the map my team uses to redraw the boundary lines so we can get them assigned to the best office."

164. On February 15, 2023, Santagati (from Subject Account esantagati@abacenters.com) emailed BARNETT (at Subject Account cbarnett@icbdholdings.com) and HOLZUM (at Subject Account mholzum@abacenters.com) regarding "Assessor Numbers." Santagati explained that the "November and December average for tx [treatment] plans from the assessment team was 19.9" and the "average of January and Feb so far is 25.0." Santagati represented that she had spoken with Quatiba Davis "about driving those numbers up." Santagati reported that Davis had been told by clinical staff that they were "never going to meet those hours." Santagati "reassured [Davis] that she was doing her job and on the ops side, we'd handle changing culture" with the clinical staff."

165. There is therefore probable cause to believe that evidence of the Subject Offenses in Subject Account esantagati@abacenters.com, which is associated with Emily Santagati.

**B. Quatiba Davis Accounts**

166. Quatiba Davis was previously ABACA's Vice President of Assessments and is now the company's Chief Clinical Officer. During her time with the company, based on the witness accounts above, Davis oversaw an assessment that was specifically designed in order to increase treatment plan hours when the clinical teams operating in New England were not recommending sufficient hours for BARNETT and HOLZUM. Based on a review of emails retrieved through a search warrant on BARNETT's Microsoft OneDrive account, Davis was in frequent communication with BARNETT and HOLZUM regarding treatment hours, including that ABACA had an expected minimum average number of treatment hours, and bonuses rewarded to ABACA employees if they increased billable hours.

167. On March 27, 2023, BARNETT (from Subject Account cbarnett@icbdholdings.com) CC'ed HOLZUM (via Subject Account mholzum@icbdholdings.com) and Davis (via Subject Account qdavis@abacentersfl.com) on an email to an ABACA employee with the subject line "Billable hours." BARNETT wrote, "I wanted to drop a line and say thank you. I understand you have been working tirelessly to serve our clients. Thank you so much for your incredible commitment to our clients and our cause. *I understand that you broke our record with 60 billable hours last week*. (emphasis added)" BARNETT explained that he heard "from [his] boat captain" that the ABACA employee "enjoyed the boat ride with your friends." BARNETT therefore offered the employee "another charter at [his] leisure. This time, [an ABACA employee] can arrange to bring you down to Miami and check out all of the extravagant houses. Please enjoy!" Davis responded (from Subject Account qdavis@abacentersfl.com), "This is awesome!!! 👏🏾 👏🏾 👏🏾"

168. On October 20, 2023, an ABACA employee emailed BARNETT (at Subject Account cb@icbdholdings.com), and HOLZUM, (at Subject Account mholzum@icbdholdings.com), the "discharge summary and progress report" for a client treated at ABACA's Salem location. BARNETT forwarded the email to Davis, via Subject Account qdavis@icbdholdings.com, saying, "Quatiba, This is a young child with great reimbursement rates. Do you agree with the clinical director that this client no longer would benefit from our services? After digging in, call me to discuss over the phone please. Something smells fishy here…" Davis responded that she would not have supported the discharge, based on the client file which still included maladaptive behaviors. BARNETT responded, "That's what I was afraid of. Seems like a teachable moment… If you dig in, you will find the angle for why clinical discharged so that you can train and teach. It doesn't make sense to discharge a good payer that needs our services."

169. On December 14, 2023, Quatiba Davis (from Subject Account qdavis@abacentersfl.com) emailed BARNETT (at Subject Account cb@icbdholdings.com) and Eric Foust (at Subject Account efoust@exactbilling.com) to discuss BARNETT's request that the team bill for time spent with a "diagnostic specialist." Davis said that "Chris [BARNETT] would like the Diagnostic Specialist to bill for consultation/feedback. On September 25, when I called a meeting to solidify codes in ABA connect and expedite billing for clients who were previously evaluated, we could not together identify a code that we could bill under for the Techs to complete this service. He informed us that you know a code . . . ." Foust did not respond, but BARNETT told Davis, "Send Eric [Foust] the work flow and events and he will get back to you with what codes he will be billing."

170. On April 19, 2024, Quatiba Davis emailed BARNETT and HOLZUM (from Subject Account qdavis@icbdholdings.com), requesting that her salary be increased to $325,000.

In support of her request, she wrote, "Notably, I *spearheaded the creation of the assessment team* across all regions in November 2022, achieving the company's metric of a 72-hour turnaround time consistently and *increasing treatment plan average*, thereby contributing to a financial growth" of approximately "$38,301,074.00" in 2023 and "$24,179,173.00" in 2024 for a total of "$62,480,247.00" (emphasis added). For her estimation of increased value, Davis relied only on ABACA's billing for CPT Code 97151, which is the code used to bill for assessments. Therefore, in this email, Davis is telling BARNETT and HOLZUM that ABACA was able to bill over $60 million for a code based only on her assessment team (not including, for example, the additional profits based on billing for the additional treatment hours recommended by her assessment team under CPT Code 97153).

171. On August 6, 2024, BARNETT (from Subject Account cb@icbdholdings.com) emailed Davis (at Subject Account qdavis@abacenters.com) to ask that she review treatment plans created by ABA Centers of America clinical employees. He explained that ABA Centers of America "is our highest margin region and also our lowest prescribed Tx [Treatment] Plan hours. The data points to the prescribed hours not being clinically appropriate. Please dig in here and put a scalable process in place where we can ensure the concurrent auths and prescribed Tx Plan hours are clinically appropriate. ABACOA is around 20 and the company KPI is clinically appropriate Tx Plan hours of 25. I know you have already addressed and attacked this issue with SPs [Super Payors] and other regions so I'm sure you can add value here also." Davis responded that she would.

172. According to a calendar invitation, BARNETT (via Subject Account cb@icbdholdings.com) met with HOLZUM (via Subject Account mholzum@icbdholdings.com), Emily Santagati (via Subject Account esantagati@abacenters.com), Michael Holzum Jr (via

Subject Account michaeljr@icbdholdings.com), and Quatiba Davis (via Subject Account qdavis@abacaresfl.com) in September 2024 to discuss Clinical Operations. The event description includes that they would be discussing "BCBA Caseload," "Outcomes," and the "Importance of 97155, 97156, and 97157," which are the CPT codes used to bill for a BCBA performing an assessment, a BCBA providing caregiver training, and a BCBA providing group training to multiple caregiver families, respectively.

173. Based on the witness statements and the emails described above, there is probable cause to believe that there is evidence of the Subject Offenses within Subject Accounts qdavis@abacentersfl.com, qdavis@icbdholdings.com, qdavis@abacenters.com, and qdavis@abacaresfl.com.

**C. Steve Del Mauro Accounts**

174. Steve Del Mauro served as the Executive Vice President of Admissions for the ICBD Holdings companies, which would include ABACA. He was also the Regional Chief Operations Officer for ICBD Holdings. Del Mauro met BARNETT when Del Mauro started working at a sober home owned by BARNETT in New Hampshire in August 2017. He then joined ICBD HOLDINGS in 2019, until he left the company in September 2023.

175. When interviewed, Del Mauro reported that BARNETT categorized patients based on how much the patient's insurance reimbursed, from "super payor" to "mid payor" and "scholarship." As discussed above, Del Mauro was included in emails in which BARNETT flagged that ABACA had a "new super payer" and specifically asked Emily Santagati to audit the treatment plan. This included the instance above in which BARNETT reviewed Emily Santagati's treatment recommendation and asked, "Why not shoot for more?" BARNETT CC'ed Del Mauro (via Subject Account sdelmauro@icbdholdings.com) in that email. *See* Supra ¶ 159.

176. According to the statements from Kate Berlongieri, which were discussed previously, Del Mauro was present when Berlongieri confronted the majority of the C-suite executives of ICBD HOLDINGS in the spring of 2023 to say that she believed that the company was engaged in fraudulent billing practices.

177. According to Del Mauro, ABACA assigned Massachusetts patients with insurance through BlueCross BlueShield to clinics in New Hampshire. Even if a patient was treated at the patient's home or at a clinic in Massachusetts, ABACA billed those services as though they were provided in New Hampshire. According to Del Mauro, everyone at ABACA knew that this was happening and it was a directive from BARNETT. Del Mauro said that he specifically created a Google Map that displayed all ABACA patients and clinic locations. Additionally, as discussed above, he was CC'ed (via the Subject Account sdelmauro@abacenters.com) on emails that discussed billing Massachusetts clients out of New Hampshire. *See* Supra ¶ 163.

178. According to an email from BARNETT's OneDrive account, Del Mauro (from Subject Account steved@abacenters.com) emailed BARNETT (at Subject Account cbarnett@icbdholdings.com), HOLZUM (at Subject Account mholzum@abacenters.com), and Shawn Westberg (at Subject Account swestberg@abacenters.com) with the subject line "Super Payer." Del Mauro explained that they had performed an assessment on a client "and it was determined that they weren't appropriate for our care" because the client "was exhibiting self injurious behaviors (SIB) and we recommended a residential program." Since performing the assessment, however, they learned that insurance "paid 100% and this is a BCBS MA [BlueCross BlueShield of Massachusetts] self-funded plan." BARNETT responded, "GET THIS CLIENT PLEASE." Shawn Westberg clarified, "What promises am I able to make mom, Can I say that we are better equipped now to provide the service necessary for him and would like to admit him back

to our program?" Another ABACA employee advised that Shawn Westberg should represent that they had "well equipped team members who can now provide the best-in-class care for your family member." Therefore, according to this email, ABACA made its admissions decisions based entirely on a client's rate of reimbursement, not what was medically appropriate. In fact, according to this email thread, even if the team thought that it was medically inappropriate because a client was engaging in self-harm, the company would still recommend admission based on insurance reimbursement.

179. There is therefore probable cause to believe that evidence of the Subject Offenses will be located in Subject Accounts sdelmauro@icbdholdings.com, sdelmauro@abacenters.com, and steved@abacenters.com, which are all associated with Steve Del Mauro.

**D. Barbara Kelly Accounts**

180. Barbara Kelly is the Chief Billing Officer of ICBD Holdings. Based on interviews of former ICBD employees [A. Solomon and D. Dodge], investigators believe Kelly to be part of ICBD leadership and an employee who received distribution payments based on an ownership stake in ICBD. Kelly has also been identified as the individual who runs Exact Billing Solutions.

181. According to the statements from Kate Berlongieri, which were discussed previously, Kelly was present when Berlongieri confronted the majority of the C-suite executives of ICBD HOLDINGS in the spring of 2023 to say that she believed that the company was engaged in fraudulent billing practices.

182. According to a calendar invite, BARNETT (at subject account cbarnett@icbdholdings.com) met with Barbara Kelly (at Subject Account bkelly@exactbilling.com) Steve Del Mauro (at subject account sdelmauro@icbdholdings.com), and BARNETT's sister, Nicole Clark. The description of the calendar event includes an email

thread in which Steve Del Mauro wrote to Barbara Kelly, "Hi Barb, I apologize in advance as I know you're super busy. This was a claim that we received at ABA Cares for a 97151 [the CPT Code used to bill for an initial assessment] with BCBS FL. As you can see the rates are abysmal. You probably won't be able to increase the rates but if there's anyone that can make this better it's you. You're our favorite Chief Billing Officer. Thank you Barb!" BARNETT then forwarded the Zoom invite and Del Mauro's message to several email addresses including Barbara Kelly (at Subject Account bkelly@exactbilling.com). In his forwarded email, BARNETT wrote "Can you please call tomorrow Barbara." Kelly responded (from Subject Account bkelly@exactbilling.com), explaining that she had done "some research on BCBS FL. I took one group that was in network and then did Quatiba Davis to see the allowable. Quatiba is out of network per BCBS FL website."

183. Kelly also received emails from BARNETT regarding specific ABACA clients. On January 2, 2022, BARNETT (from subject account cbarnett@icbdholdings.com) emailed Kelly (at subject account bkelly@exactbilling.com) writing, "Happy new Year! Barbara – please make getting [a client's] SCA [Single-Case Agreement] extended the priority for Monday. This is a good payer and shouldn't wait."

184. Based on the witness statements and the emails described above, there is probable cause to believe that there is evidence of the Subject Offenses within Subject Account bkelly@exactbilling.com.

**E. Javier Cabrera Accounts**

185. Javier Cabrera was ICBD Holding's Chief Technical Officer. He was responsible for the launch of ABACA's own electronic medical records, ABA Connect, which was created in part to house medical records in Medellín, Colombia. Previously seized emails from accounts

belonging to BARNETT show that Cabrera was responsible for other technical elements at ICBD Holdings and ABACA, including creating a "Census Tracker" for current patients, which categorized clients based on insurance reimbursement.

186. On January 6, 2022, Cabrera (using subject account jcabrera@icbdholding.com) emailed BARNETT, writing: "Chris, This is a preview of the Super Payors. I still need to add their home office, which is important. I'll rename the %Paid to Collection Rate or something similar." CABRERA then included an example:

Super Payors for ABA

From CollabMD, select patients with at least 10 claims and Collections >= 0.6 of Billed

| PAYOR | PATIENT | PATIENT NAME | % PAID |
|---|---|---|---|
| OPTUMHEALTH BEHAVIORAL SOLUTIONS | 42071468 | HAMZA KAPIDZIJA | 96.38% |
| | 43243640 | SHIVANI MENON | 60.19% |
| | 44775752 | CARY LENT | 93.51% |
| UNITED BEHAVIORAL HEALTH | 41871128 | MASON CHAPMAN | 99.66% |

187. Later on in this email thread, BARNETT (using Subject Account cbarnett@icbdholdings.com) added others, including Kelly, (using Subject Account bkelly@exactbilling.com) and wrote to Kelly, Cabrera, and others, "Let's change the definition of superpayors to 40% that's more appropriate."

188. On May 30, 2023, Cabrera (from Subject Account jc@icbdholdings.com) emailed BARNETT about a specific client, explaining that the client had not received services in seven days. BARNETT (using Subject Account cb@icbdholdings.com) forwarded the email to Emily Santagati (at Subject Account esantagati@abacenters.com) and HOLZUM (at Subject Account mholzum@icbdholdings.com), asking simply "Why?" Santagati explained that the client only had Medicaid, because the parent's benefits through COBRA had ended. BARNETT responded, "Why

would it be Medicaid? Dad had new job with Cigna. Why didn't we get a SCA [single case agreement] with Cigna? This is shit management and a mistake that costs 7 figures."

189. On November 16, 2022, Cabrera (from Subject Account jcabrera@abacenters.com) emailed BARNETT (cbarnett@icbdholdings.com), HOLZUM (mholzum@abacenters.com), and others, explaining that his team "constantly recalculate[d] the rates to determines if a client is an SP [Super Payor], MidPayor, or Scholarship. To do that, we take the last 3 months and use the claims in that period."

190. Based on the witness statements and the emails described above, there is probable cause to believe that there is evidence of the Subject Offenses within Subject Accounts jcabrera@abacenters.com, jcabrera@icbdholding.com, and jc@icbdholdings.com, which are associated with Javier Cabrera.

**F. Michael Holzum Jr. Accounts**

191. Michael Holzum, Jr. is the Chief Operation Officer of ICBD Holdings. Email signatures also identify him as Vice President of Corporate Development for ABA Centers and ICBD Holdings, LLC, as well as VP of Real Estate for ICBD Holdings, LLC. Holzum Jr. is believed to have been responsible for tracking ABACA's collection of payments that had been made from insurance carriers directly to patients ("P2P" or "paid to patient").

192. According to the statements from Kate Berlongieri, which were discussed previously, Holzum Jr. was present when Berlongieri confronted the majority of the C-suite executives of ICBD HOLDINGS in the spring of 2023 to say that she believed that the company was engaged in fraudulent billing practices.

193. On February 21, 2024, BARNETT (from Subject Account cb@icbdholdings.com) emailed Holzum Jr. (at Subject Account michaeljr@icbdholdings.com) and asked that he "take a

look at" projected numbers for potential opportunities to increasing marketing for specific clinics. Mike Holzum Jr. responded saying, "I think it probably makes more sense to up the spend overall in ABACOA [the New England region] as a region with saturated hard spaces coming online in MA and to find additional BCBS MA kiddos that we'll serve from NH (highest margin)." Therefore, Holzum Jr. emailed with BARNETT explicitly discussing intentionally servicing clients out of New Hampshire because their insurance paid a higher reimbursement.

194. On December 13, 2024, BARNETT, after receiving an update on the status of "P2P payments" emailed (from Subject Account cb@icbdholdings.com) Holzum Jr. (at Subject Account michaeljr@icbdholdings.com) writing, "Where are these P2P payments? . . . We really need to instill a sense of urgency to the P2P department." Holzum Jr. responded, "Communication has been made with these new families with the new P2P coordinators and the rapport is being built. A handful of the patients have already submitted checks and the others are on the lookout. We're following the checks and EOBs through to the payment posting side." Therefore, BARNETT emailed with Holzum Jr. about tracking insurance payments that had been made to ABACA clients, which ABACA intended to collect.

195. Based on the witness statements and the emails described above, there is probable cause to believe that there is evidence of the Subject Offenses within the Subject Account michaeljr@icbdholdings.com.

**G. Sarah Glidden Accounts**

196. Sarah Glidden was the Executive Director and Vice President of ABACA and now serves as Vice President of ABA Centers of America's Nashua, NH clinic. Glidden does not have a clinical background or training. In one interview with a former ABACA BCBA, however, the BCBA described catching Glidden changing the BCBA's treatment plan to recommend additional

treatment hours for the particular patient. Glidden is believed to have an ownership stake in ABACA.

197. Glidden used her assigned email addresses (Subject Account sglidden@abacenters.com) to email BARNETT and others weekly updates regarding her ABACA location and what clients had met all of their assigned hours or, if they had missed scheduled hours, what the reason was (e.g. illness, vacation, etc.).

198. On February 8, 2022, an ABACA employee emailed Sarah Glidden (at Subject Account sglidden@abacenters.com), Steve Del Mauro (at Subject Account steved@abacenters.com), and Shawn Westberg (at Subject Account swestberg@abacenters.com), advising that the employee was trying to submit a reauthorization with United Healthcare on a specific patient, but United was asking whether ABACA wanted to use a Single-Case Agreement or use the client's out-of-network benefits. Shawn Westberg responded, including Glidden and Steve Del Mauro, to say, "Nope Out of network please." Westberg then replied once again, advising that they should "let the bosses chime in."

199. As described above, Sarah Glidden was included in an email from BARNETT to Emily Santagati, Javier Cabrera, and others, in which BARNETT advised that they had a "new super payer." BARNETT then asked Santagati to review the treatment plan and, when he thought Santagati was not recommending enough hours, asked, "why not shoot for more?" and included the Subject Accounts associated with Steve Del Mauro, Sarah Glidden, Javier Cabrera. *See* Supra ¶ 159.

200. On August 23, 2023, Glidden received an invitation to a calendar event (at Subject Account sglidden@icbdholdings.com), as well as BARNETT (at Subject Account cb@icbdholdings.com), HOLZUM (at Subject Account mholzum@icbdholdings.com), Michael

Holzum Jr. (at Subject Account michaeljr@icbdholdings.com), and Quatiba Davis (at Subject Account qdavis@abacaresfl.com). The description of the calendar event reads, in part, "Sarah to share details about clients and employees that being serviced/billed outside of their 'home' clinic and why." According to this email, BARNETT and the others associated with the SUBJECT ACCOUNTS were distinguishing between people who were "serviced" and "billed" in different locations and also discussed why those individuals might be billed in different locations. This corroborates the witness statements about ABACA intentionally billing patients out of New Hampshire because insurance paid at a higher rate of reimbursement.

201. Based on the witness statements and the emails described above, there is probable cause to believe that there is evidence of the Subject Offenses within Subject Accounts sglidden@abacenters.com and sglidden@icbdholdings.com, which are associated with Sarah Glidden.

**H. William Klein Accounts**

202. William Klein previously worked as the Director of Utilization Review at Exact Billing Solutions. In that role, Klein was in charge of utilization review, authorization, and credentialing. Klein also managed the single-case-agreement team.

203. On August 27, 2023, an anonymous report was submitted to Point32, which operates the Tufts and Harvard Pilgrim insurance carriers, by johns_2023@yahoo.com. The email claimed that ABACA had a "CEO-led directive" to put patients on a single-case agreements due to the "obscenely high dollar amount" per unit of ABA treatment, charging $285 per therapy unit as compared to the national average of $25 per therapy unit. The anonymous report alleged that ABACA had an entire department dedicated to securing single-case agreements, which "masquerad[ed] as 'Patient Advocates.'"

204. On November 8, 2024, William Klein was interviewed by Point32's Special Investigations Unit. Klein explained to Point32 that the single-case-agreement team focused on converting ABACA's current cases to single-case agreements. An ABACA employee would reach out to a patient's family and educate them about how they could secure a single-case agreement to provide out-of-network coverage. The ABACA employee would then facilitate communications with the family's insurance carrier, as well as assist in contacting in-network providers so that they could document that there were no available in-network providers. When asked what would happen if an in-network provider in fact had availability, Klein explained that it was unlikely that any provider would have availability after ABACA's single-case-agreement team's process because "[t]he line of inquiry hardly ever produce[d] an available provider." Klein explained that it was common to have standard processes or scripts and that the calls "may not be done in good faith." If an ABACA employee pushed back on the single-case-agreement process, they were terminated.

205. On January 6, 2025, the government interviewed Klein. According to Klein, BARNETT assigned him the task of converting all ABACA patients to single-case agreements, with an average of thirty to sixty patients per month. HOLZUM was also aware of the project. Klein further explained that ABACA leadership would record the single-case-agreement team's calls with insurance carriers and then critique the team for not being aggressive enough in trying to maximize therapy hours. Klein described the single-case-agreement team as "a vessel to secure a higher rate." Klein believed that ABACA's practice of requiring single-case agreements was dishonest and was motivated by high reimbursement rates.

206. At the conclusion of the interview, the government received an email from johns_2023@yahoo.com. That email included an attachment of a twenty-eight-page fraud tip

report. According to a response from Yahoo, the email address johns_2023@yahoo.com uses a recovery phone number that belongs to Klein. The fraud tip report begins, "This report is based on direct knowledge of the internal workings of the companies, revealing potential fraudulent activity across a series of interrelated entities, including ABA Centers . . . Exact Billing Solutions, and other associated companies."

207. According to the fraud tip report, ABACA systematically redirects claims for clients residing in Massachusetts to be billed through BlueCross BlueShield of New Hampshire because BlueCross BlueShield of New Hampshire offers full reimbursement rates that are significantly higher than the reimbursement rates provided by BlueCross BlueShield of Massachusetts.

208. The fraud tip report alleges that ABACA would request additional therapy units from insurance carriers, in contrast to what was actually recommended by the ABACA therapist treatment plan. ABACA would then mislead patients and their families about the legitimacy of these evaluations. The fraud tip report traces this back to BARNETT, whose "influence and pressure have led to a culture where the accuracy of diagnoses is second to the business goal of increasing client intake."

209. According to the fraud tip report, ABACA categorized its minor patients based on insurance carrier reimbursement, including referring to minor patients whose insurance provided high reimbursement as "super payors." ABACA would then provide additional treatment to those "super payor" patients, even in instances in which it would be medically appropriate to reduce treatment over time.

210. ABACA provided an incentive to its employees to bill for as many hours as possible, including paying bonuses ranging from $10,000 to $50,000 to employees who billed thirty to fifty hours of therapy per week.

211. In addition to the fraud tip report's allegations involving health care fraud, the report makes a number of assertions that detail how BARNETT laundered the funds that he received from ABACA for his personal use. For example, the report describes how BARNETT diverted capital raised from loans that ABACA obtained, in order to fund his "personal luxuries," including a yacht, a $100,000-per-night private cruise, and attempting to acquire a private jet.

212. The fraud tip report describes how "BARNETT's business structure often uses different banking institutions, creating a complex network of accounts across multiple banks. This diversification across banks creates a patchwork of financial records that would require significant effort to trace, making it extremely difficult for investigators to follow the flow of funds through the companies. This strategy enables BARNETT to shift money between entities while avoiding patterns that might trigger alerts or inquiries. By separating funds into multiple accounts and banks, BARNETT minimizes transparency, ultimately making the money's true origin, purpose, and destination far more difficult to track."

213. The fraud tip report describes ABACA's superficial collection of payments owed by patients. The report stated, "While patients typically bear a higher financial responsibility for out-of-network services, the company (ABACA) often proposes a token payment plan, asking caregivers to pay a mere $1. This appears to be a superficial gesture to show a semblance of collecting due payments."

214. Emails obtained through a search warrant on BARNETT's OneDrive account corroborate much of what Klein reported to the government and to Point32, as well as the allegations contained in the fraud tip report.

215. For example, and as discussed above, Klein reviewed treatment plans created by Santagati and emailed that review to BARNETT, in which Klein recommended increasing hours for those treatment plans. Klein summarized that review in a "list of Super Payors, their current recommendations, and then alongside recommendations by UR [Utilization Review, Klein's department]," which Klein emailed (from Subject Account wklein@exactbilling.com) to BARNETT (at Subject Account cbarnett@icbdholdings.com) and Santagati (at Subject Account esantagati@abacenters.com).

216. Additionally, according to statements from Larissa Fedak, ABACA used a template for autism diagnoses, which was originally created by Santagati and then updated by Klein. According to Fedak, Klein's updates were specifically designed to include things that would make it less likely to be challenged by insurance companies.

217. There is therefore probable cause to believe that there will be evidence of the Subject Offenses located in the Subject Account wklein@exactbilling.com, which is associated with William Klein.

**I. Eric Foust Accounts**

218. Eric Foust served as the Chief Executive Officer of Exact Billing Solutions, a billing company under the umbrella of ICBD Holdings that submitted claims for reimbursement to insurance carriers on behalf of other ICBD Holdings companies, including ABACA.

219. As described above, Foust was included in communication in which ABACA employees discussed how BARNETT would like certain procedures billed. In one instance

described above, Quatiba Davis emailed Foust (at Subject Account efoust@exactbilling.com) to say that she did not know of a code that would allow a "Diagnostic Specialist" to bill for consultation or feedback, but BARNETT had "informed [Davis] that [Foust] kn[e]w a code . . . ." Although Foust did not respond, BARNETT told Davis to send Foust the "the work flow and events" so that Foust could tell Davis "what codes he w[ould] be billing."

220. On August 22, 2024, Foust (from Subject Account efoust@exactbilling.com) emailed BARNETT (at Subject Account cb@icbdholdings.com) an Excel spreadsheet in which Foust tracked thousands of claims that had been submitted to insurance companies, including BlueCross BlueShield of Massachusetts, BlueCross BlueShield of New Hampshire, Harvard Pilgrim, Optum, Tufts, and United Healthcare, on behalf of the ICBD Holdings companies, including ABACA. BARNETT responded, "Now we are talking."

221. As discussed previously, because ABACA remained out of network, clients would sometimes receive checks from their insurance carriers, which ABACA would then collect. On October 18, 2024, BARNETT (from Subject Account cb@icbdholdings.com) emailed Foust (at Subject Account efoust@exactbilling.com) and Michael Holzum Jr. (at Subject Account michaeljr@icbdholdings.com) to ask "how many patients do our P2P department think are P2P?" Foust responded that they had identified 260 P2P clients. BARNETT responded, "By the end of next week, I want to know exactly how much money is outstanding on all of the patients that are P2P."

222. Therefore, there is probable cause to believe that evidence of the Subject Offenses will be located within Subject Account efoust@exactbilling.com, which is associated with Eric Foust.

**J. Shawn Westberg Accounts**

223. Shawn Westberg is ABACA's Director of Admissions. He is therefore responsible for admitting new clients and assigning them to ABACA's clinics.

224. As discussed above, Shawn Westberg emailed regarding how ABACA would intentionally bill BlueCross BlueShield of Massachusetts clients out of New Hampshire, including the email (from Subject Account swestberg@abacenters.com) in which he referenced that he "spoke with Chris [BARNETT]" and "discussed the office locations for our BCBS of MA kiddo's" and requested that they "go over the map my team uses to redraw the boundary lines" to assign to the appropriate clinic. *See* Supra ¶ 163.

225. Further, Shawn Westberg emailed (from Subject Account swestberg@abacenters.com) to ask what "promises" he could make to the mother of the child who was engaging in self-harm, and who ABACA had initially told would not be a good fit for their services and should instead be in a residential-treatment program. *See* Supra ¶ 178. That email from Westberg, in which he advocated that he could say that they were now "better equipped" to provide services to the child discussed intentionally making a misrepresentation to a parent in order to ensure that the child would enroll with ABACA, all because the child's insurance paid a high rate of reimbursement for their assessment.

226. There is therefore probable cause to believe that there will be evidence of the Subject Offenses within Subject Account swestberg@abacenters.com, which is associated with Shawn Westberg.

**K. Ed McDonough Accounts**

227. Ed McDonough was ABACA's Regional Director of Operations for ABACA's Northeast clinics, which included the clinics in Massachusetts and New Hampshire, before

transitioning to Vice President of Operations for ABA Centers of Florida, one of the other ICBD Holdings companies.

228. According to Haley King, McDonough was present in meetings with HOLZUM and BARNETT in which they discussed that bonuses were calculated based on the employee's billing.

229. As previously discussed, Ed McDonough was included (via Subject Account emcdonough@icbdholdings.com) in discussions with BARNETT and others regarding a "Super Payer List" in which the ABACA employees discussed reassigning clients to different BCBAs in order to remain out of network, so that those clients could retain their "Super Payer" status. *See* Supra ¶ 161.

230. Similarly, McDonough (via Subject Account emcdonough@abacenters.com) was included in emails from BARNETT in which he instructed ABACA staff to intentionally reassign clients from an in-network BCBA to an out-of-network BCBA, explaining that "If that is the only thing that is working, then we need to do that in the next 48 hours." *See* Supra ¶ 162.

231. Further, as discussed above, according to Glenna Magowan, she was specifically instructed by BARNETT and McDonough that all BlueCross BlueShield of Massachusetts clients were to be billed from an ABACA clinic in Salem, New Hampshire, despite the fact that ABACA did not actually have an office in Salem.

232. According to Haley King, ABACA provided bonuses to its employees, which King was told by BARNETT, HOLZUM, and McDonough were specifically based on how much the employee had billed.

233. Therefore, based on the witness statements and emails included above, there is probable cause to believe that there will be evidence of the Subject Offenses located in Subject

Accounts emcdonough@icbdholdings.com and emcdonough@abacenters.com, which are associated with Ed McDunough.

**L. Nate Irvine Accounts**

234. Nate Irvine is a member/owner of ABACA and ICBD Holdings, as well as his own company, "NTI Marketing LLC," which has its principal place of business at 131 DW Hwy #112 in Nashua, New Hampshire. NTI Marketing is listed as an "Authorized Person" on ICBD Holdings' registration with the Florida Secretary of State. BARNETT frequently emailed Irvine regarding the disbursement of funds from ICBD Holdings and its companies to BARNETT, Irvine, and others.

235. For example, on September 8, 2023, BARNETT (from Subject Account cb@icbdholdings.com) emailed a number of individuals, including IRVINE (at Subject Account nirvine@icbdholdings.com) regarding Agile's ABA Holding's distributions. BARNETT, in reference to Irvine, wrote, "Nate – you probably want your ICBD distros to go to your UBS account also. I would also suggest your EBDS distros to your UBS account, as we discussed… If so, indicate you want ABA Holdings, EBS, and ICBD in this thread." Irvine responded (from Subject Account nirvine@icbdholdings.com) "Approved".

236. On July 2, 2024, BARNETT (from Subject Account cb@icbdholdings.com) wrote: "Agile hereby votes to do a $700k ICBD tax distribution today. Does NTI agree?" IRVINE (from Subject Account nirvine@icbdholdings.com) replied, "Nti agrees."

237. Based on the witness statements and the emails described above, there is probable cause to believe that there is evidence of the Subject Offenses within Subject Account nirvine@icbdholdings.com, which is associated with Nate Irvine.

**M. HOLZUM Accounts**

238. There is probable cause, based on the emails already included above, to believe that evidence of the TARGET OFFENSES will be located in the Subject Accounts associated with HOLZUM. He was included in emails in which BARNETT directed ABACA employees to increase treatment hours. *See* Supra ¶ 157. He was included in emails in which ABACA staff informed BARNETT that they were reviewing every treatment plan to make sure that sufficient hours were recommended. *See* Supra ¶ 158. He was included in emails in which BARNETT directed staff to intentionally reassign clients to out-of-network BCBAs in order to maximize reimbursement. *See* Supra ¶ 162. He was included in emails in which ABACA staff openly discussed intentionally billing services out of different locations to maximize reimbursement. *See* Supra ¶ 163. He was included in emails in which ABACA leadership offered incentives to employees to increase billable hours. *See* Supra ¶ 167. He was included in emails in which ABACA staff advocated for enrolling clients, who they had previously deemed medically inappropriate for their services, simply because the clients had insurance that paid at a higher rate. *See* Supra ¶ 178.

239. In addition to those emails already discussed above, the following communications between HOLZUM and BARNETT make evident that there will be evidence of the TARGET OFFENSES located in the Subject Accounts associated with HOLZUM.

240. On December 30, 2022, HOLZUM (from Subject Account mholzum@icbdholdings.com) emailed BARNETT (at cbarnett@icbdholdings.com) an inventory of patients who were in the "treatment plan submitted" stage. HOLZUM told BARNETT that "5 [clients] are in 'Portsmouth' MA BCBS – they do not have an available BCBA." HOLZUM is therefore telling BARNETT that they are basing the place of service on the patient's insurance,

routing BlueCross BlueShield of Massachusetts clients through Portsmouth, New Hampshire, and putting "Portsmouth" in quotes, suggesting that they are not actually being treated there. Further, they are routing these patients through "Portsmouth," despite the fact that there is not a BCBA available to provide services.

241. Similarly, on May 4, 2023, BARNETT (from Subject Account cb@icbdholdings.com) emailed HOLZUM (at Subject Account mholzum@icbdholdings.com) to say, "[P]lease see below and advise why the drop in Nashua [New Hampshire]? I'm assuming it was *clients located in Massachusetts that were not paying great in NH*, so we transferred them to Mass clinics when slots became available? (emphasis added)"

242. BARNETT's emails also corroborate that he and HOLZUM, without any relevant medical training, credentialing, or qualifications that would allow him to assess a client and recommend hours, set a minimum number of treatment hours and awarded bonuses to employees for reaching those hours. On August 24, 2022, BARNETT (from Subject Account cbarnett@icbdholdings.com) emailed HOLZUM (at Subject Account mholzum@icbdholdings.com) saying, "Heads up: I have [an employee] spending no more than 3 hours tomorrow putting together a model to show *the increase in revenue by month* this year if *avg Tx plans were 25 hours* and all other things remained [sic] constant (emphasis added)."

243. It is also evident from the OneDrive returns that BARNETT utilized the Subject Accounts to communicate with HOLZUM regarding the acquisition and furnishing of a private plane. According to BARNETT's emails, he emailed (from Subject Account ch@icbdholdings.com) HOLZUM (at Subject Account mholzum@icbdholdings.com) and others, saying, "I think I can purchase the asset for a steal for south of $12MM. I'd like to finance the asset. Given that it's a 2005, what would financing possibilities be?" BARNETT attached a

brochure about the vehicle, including the serial number, which matches the plane that he purchased (SN9139) and includes the following images:




244. According to a calendar invitation created by BARNETT, he held a meeting (from Subject Account ch@icbdholdings.com) with HOLZUM (at Subject Account mholzum@icbdholdings.com) and others regarding furnishing the private plane. In the meeting agenda, BARNETT outlined and specified provisions for the jet. For example, the agenda specified that for "Throw Pillows & Blankets" for the jet, there would be separate sets for BARNETT and charter guests. BARNETT's can be "Hermes brand" while charter guest items could be "more affordable (e.g., Target blankets). As for the carpeting for the jet, BARNETT "has a specific carpet and padding in mind; no deviations are allowed." The agenda further specified that, with respect to the galley of the jet, "Hermes china" was recommended for service for "12" guests and "Two-tone silverware from Hermes or Christofle" should be used. Other entertainment items for the jet were specified, including a "Hermes travel chess set (to be owned by the company used on the plane)." Regarding WiFi, BARNETT "would like a system where everyone's wifi can be shut off at [his request]."

**N. BARNETT Accounts**

245. Because all of the emails described above, which provide probable cause to believe that evidence of the TARGET OFFENSES will be located in the Subject Accounts associated with those individuals, were obtained by the government from a search warrant executed on cb@icbdholdings.com and cbarnett@icbdholdings.com, both of which are associated with BARNETT, there is probable cause to believe that evidence of the TARGET OFFENSES will be located in those accounts.

**CONCLUSION**

246. For all of the reasons described above, there is probable cause to believe that evidence of the TARGET OFFENSES, as described above and in Attachment B of this Affidavit, will be found in searches of the SUBJECT ACCOUNTS, as further described in Attachment A of this Affidavit.

Sworn to under the pains and penalties of perjury.

/s/ Victoria E. Mens_______
Victoria E. Mens
Special Agent
Department of Health & Human Services
Office of Inspector General

Attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this 31st day of December, 2025.

Andrea K. Johstone
United States Magistrate Judge
United States District Court
District of New Hampshire
Date: December 31, 2025

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the following accounts (collectively, the "**SUBJECT ACCOUNTS**") cbarnett@icbdholdings.com, cb@icbdholdings.com, mholzum@icbdholdings.com, mholzum@abacenters.com, efoust@exactbilling.com, swestberg@abacenters.com, emcdonough@abacenters.com, emcdonough@icbdholdings.com, esantagati@abacenters.com, jc@icbdholdings.com, jcabrera@abacenters.com, jcabrera@icbdholdings.com, michaeljr@icbdholdings.com, bkelly@exactbilling.com, sglidden@icbdholdings.com, sglidden@abacenters.com, qdavis@abacentersfl.com, qdavis@icbdholdings.com, qdavis@abacenters.com, qdavis@abacaresfl.com, sdelmauro@icbdholdings.com, sdelmauro@abacenters.com, steved@abacenters.com, wklein@exactbilling.com, and nirvine@icbdholdings.com that is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company headquartered at One Microsoft Way, Redmond, Washington.

# ATTACHMENT B

## Particular Things to be Seized

## I. Information to be disclosed by Microsoft Corporation ("Microsoft")

To the extent that the information described in Attachment A is within the possession, custody, or control of Microsoft, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Microsoft. Microsoft is required to disclose to the government the **SUBJECT ACCOUNTS** or identifier listed in Attachment A the following information from June 1, 2021, to present, unless otherwise indicated:

A. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Names (including subscriber names, user names, and screen names);
2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);
3. Telephone numbers, including SMS recovery and alternate sign-in numbers;
4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;
5. Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers;
6. Length of service (including start date and creation IP) and types of service used;
7. Means and source of payment (including any credit card or bank account number); and
8. Change history.

9. Accounts associated by cookie, SMS, recovery email, or IP address.

B. All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, Apple Hardware IDs and telephone numbers.

C. Records of user activity for each connection made to or from the Account(s), including, for all Microsoft services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Microsoft service, and all activity logs.

D. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails. All forwarding or fetching accounts relating to the accounts.

E. Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, to which the user belongs or communicates with; user settings; and all associated logs and change history.

F. Any records pertaining to the user's calendar(s), including: Calendar events; Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history.

G. The contents of all text, audio, and video messages associated with the account, including Microsoft Teams (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history.

H. The contents of all records associated with the account in Microsoft OneDrive, Microsoft 365 or Office 365 including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other related services or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

I. All maps data associated with the account related to Bing Maps, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

J. All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history.

K. All payment and transaction data associated with the account, including: records of purchases, money transfers, and all other transactions; address books; stored credit; gift and loyalty cards; associated payment cards, including any credit card or bank account number, PIN, associated bank, and other numbers; and all associated access and transaction logs, including IP address, time stamp, location data, and change history.

L. All Internet search and browsing history, and application usage history, including Microsoft Translate queries, Bing Search, Copilot, Edge Browser, and Cortana Assistant, including: search queries and clicks, including transcribed or recorded voice queries and responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

M. All records associated with Microsoft Advertising network utilization relating to the **SUBJECT ACCOUNTS**, including: any purchased advertising; information relating to targeting of Ads based on geolocation or user characteristics; internet domains associated with any ads or targeted ads and any records of users interacting with ads purchased or placed by the **SUBJECT ACCOUNTS**.

N. **Accounts associated by cookies, SMS number, Android ID, IMEI, telephone number, or recovery, secondary, forwarding, or alternate email address.**

O. For all accounts associated by cookies, SMS number, Android ID, IMEI, telephone number, or recovery, secondary, forwarding, or alternate email address, provide:

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, service addresses, residential addresses, business addresses, and e-mail addresses);

3. Local and long-distance telephone connection records (including records of text messages sent and received);

4. Records of session times and durations;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including model type/numbers, phone numbers, IMSIs, IMEIs, MEIDs, UDIDs, MAC addresses, and advertising IDs);

7. Other subscriber numbers or identities, including any temporarily assigned network addresses (including the registration and session IP addresses with associated port numbers); and

8. Means and source of payment for such service (including any credit card or bank account number).

**Microsoft is hereby ordered to disclose the above information to the government within 14 DAYS of issuance of this warrant.**

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, or instrumentalities of false statements related to a health care matter in violation of Title 18, United States Code, Section 1035; health care fraud, in violation of Title 18, United States Code, Section 1347; wire fraud, in violation of Title 18, United States Code, Section 1343; conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); and transacting in criminal proceeds, in violation of Title 18, United States Code, Section 1957, those violations involving Christopher Barnett occurring June 1, 2021, including, for each Account or identifier listed on Attachment A, information pertaining to the following matters:

a. All communications among or involving ABA Centers of America LLC ("ABACA"), ICBD Holdings, and Exact Billing Solutions employees (current and former); and/or between and among employees (current and former) regarding business practices; autism therapy practices; patient care; compensation; government regulations concerning autism therapy services; compliance policies, procedures, and internal controls; government investigations; financial growth, financial health, revenue, hours rendered and billed, productivity of employees, metrics and goals; insurance programs; and strategic plans;

b. All communications constituting, concerning, or referring to bills, invoices and claims for payment or reimbursement for services billed to government health care benefit programs and private insurance carriers, for any patients who received, or were billed for, services relating to autism therapy. Among other records, this would encompass billing records, including electronic claim forms or claims, superbills, charge sheets, billing summaries, account details, provider agreements, requests or demands for payment from any health care benefit program or medical insurance company, health care program or medical insurance company correspondence, explanation of benefits, recoupments, overpayments and adjustments;

c. Information related to soliciting, advertising, marketing, and acquisition of patients, including the use of Internet marketing and/or social media;

d. Information related to credentialing and/or de-credentialing clinicians with insurance carriers;

e. Information related to single-case agreements with medical insurance carriers;

f. Information related to patient out-of-pocket costs, including copayments and coinsurance requested, submitted and paid;

g. Information related to a categorization of patients based on their insurance carrier;

h. Information related to the hiring of medical professionals, including the interview process, training, licensing, contracting, compensation, supervision, retention, response to patient complaints, and termination;

i. Information related to patient records, including billing and/or claims records, agreements, assessments, evaluations, intake forms, progress notes, clinician case notes, plans of care, treatment summaries, notes related to services rendered, discharge summaries, discharge forms, hours of services, and correspondence or contact with the patient or the patient's guardian or representative(s) or the medical insurance provider;

j. Information regarding any and all documents, records, and communications related to ABA Centers of America, ICBD Holdings, Exact Building Solutions, or any of their related entities' financial records, including: bank statements and records, records showing compensation from those entities, investor statements, tax records, cancelled checks, deposit and withdrawal slips and records, wire transfer records, financial statements, ledgers, journals, cash receipts, cash disbursement journals, loan documents, credit card statements and receipts, receipts of expenses and purchases, bills and receipts for utilities, phone and internet service, and other documents reflecting the receipt, disbursement, and transfer of funds and other monetary transactions, including ledgers tracking amounts of money provided to or received from those entities (and/or its affiliated entities) and/or tracking investments made on behalf of those entities and/or other individuals;

k. Records and/or communications related to the alteration or destruction of documents, as well as the use of ephemeral messaging platforms (that is, digital messaging

platforms that automatically delete messages within a certain time period after the message is sent and/or read, such as Signal or WhatsApp);

l. Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

m. Evidence indicating the email account owners' concealment as it relates to the crimes under investigation;

n. Evidence indicating how and when the Subject Account and any associated or affiliated accounts were accessed or used, to determine the geographic and chronological context of account access and use, events relating to the crime under investigation, and relation to the account owner;

o. Evidence indicating how and when the Account was accessed or used, to determine the geographic and chronological context of Account access, use, and events relating to the crime under investigation and to the Account owner;

p. The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s); and

q. The identity of the person(s) who communicated with the Account about matters relating to the Subject Offenses, including records that help reveal their whereabouts.